2019 IL App (1st) 170474

No. 1-17-0474

Opinion filed on March 19, 2019.

Modified upon denial of rehearing on May 14, 2019.

Second Division

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellant, | ) | Cook County. |
| | ) | |
| v. | ) | No. 15 CR 5636 |
| | ) | |
| MARKEESE THOMAS, | ) | The Honorable |
| | ) | Steven G. Watkins, |
| Defendant-Appellee. | ) | Judge Presiding. |

JUSTICE LAVIN delivered the judgment of the court, with opinion.
Presiding Justice Mason and Justice Pucinski concurred in the judgment and opinion.

OPINION

¶ 1   Defendant Markeese Thomas was charged with aggravated unlawful use of a weapon (AUUW) after police observed defendant, while in the common area of an unlocked multiunit apartment building, hand off a gun to his friend and then flee upstairs into an apartment unit. Defendant filed a motion to quash his arrest and to suppress the evidence, which the circuit court granted. The State now appeals, arguing that there was no fourth amendment violation since defendant was not a resident of the apartment unit into which he fled and since the offense

occurred in the common area of the building. The State further argues police had probable cause for the arrest even without knowing that defendant lacked licenses under both the Firearm Owners Identification Card Act (FOID Card Act) (430 ILCS 65/0.01 *et seq.* (West 2014)) and the Firearm Concealed Carry Act (Concealed Carry Act) (430 ILCS 66/1 *et seq.* (West 2014)) and, regardless, defendant had abandoned the weapon before his arrest, thus precluding application of the exclusionary rule. For the reasons to follow, we agree with the State that the circuit court's judgment must be reversed.

¶ 2                                    BACKGROUND

¶ 3      Defendant was charged with various counts of aggravated unlawful use of a weapon following his arrest at a south side multiunit building, 7555 South Kenwood Avenue in Chicago, on March 25, 2015. The charges, in sum, asserted that defendant illegally possessed a handgun while not on his land or in his home (or another person's as an invitee) and without a valid Firearm Owners Identification (FOID) card or concealed carry license. See 720 ILCS 5/24-1.6 (West 2014). [1]

¶ 4      Defendant subsequently filed a motion to quash his arrest and suppress evidence illegally seized. [2] He asserted he was illegally stopped absent reasonable suspicion and arrested without probable cause and the items recovered were a direct result of this unlawful arrest. At the

---

[1] As discussed in further depth later, in *People v. Aguilar*, 2013 IL 112116, ¶ 20, the supreme court held that on its face section 24-1.6(a)(1), (a)(3)(A), (d) of the aggravated unlawful use of a weapon statute, found in the Criminal Code of 1961 (720 ILCS 5/24-1.6(a)(1), (a)(3)(A) (West 2008)), violated the second amendment right to keep and bear arms because it prohibited carrying a firearm outside the home. *Aguilar*, however, did not vitiate the entire AUUW statute since the right to bear arms outside the home is still subject to meaningful regulation. *Aguilar*, 2013 IL 112116, ¶ 21. To that end, in *People v. Mosley*, 2015 IL 115872, ¶ 31, the supreme court recently upheld the constitutionality in the aggravated unlawful use of a weapon statute of the FOID card requirement in subsection (a)(3)(C) and the 21-and-older requirement in (a)(3)(I) for gun possession outside the home (720 ILCS 5/24-1.6(a)(1), (a)(2), (a)(3)(C), (a)(3)(I) (West 2014)). Here, the parties do not dispute the gun charges that were lodged in this case.

[2] Although entitled "MOTION TO SUPPRESS EVIDENCE ILLEGALLY SEIZED," the substance of defendant's motion sought to quash his arrest and also to suppress evidence, and both matters were also the subject of the hearing.

ensuing hearing, Officer Caribou, of the Chicago police, first testified that on the day in question, he was on routine patrol with his partner, Officer Pena, in an unmarked car and in plainclothes, although Officer Caribou wore his police vest bearing his star number, name, and the word, "police." Officer Caribou had worked that area many times and made multiple arrests for narcotics, gangs, and drugs. He was patrolling due to the illegal activities of two rival gangs. Around 7:30 p.m., as they drove slowly down Kenwood Avenue, from about five feet away, they observed four or five males "loitering on the sidewalk in front" of the aforementioned apartment building. At that point, Officer Caribou saw two of the males, later identified as defendant and his friend Turner, "flee into the building." At that moment, Officer Caribou did not observe defendant holding a gun. On cross-examination, Officer Caribou specifically stated that defendant looked in his direction just before fleeing. After curbing his vehicle, Officer Caribou jumped out and followed the two men.

¶ 5    In response to defense counsel's question, "Had you announced your office any time prior to that?" Officer Caribou stated, "I am pretty sure we—we always say police." He then clarified that, although he did not announce his office while driving past the building, he did announce it as he left his vehicle on the sidewalk and "gave chase" into the building. Significantly, at that point defendant and Turner were already inside, and Officer Caribou lost sight of them for several seconds, as the door closed behind them. The other members of the group simply stood still on the sidewalk.

¶ 6    Subsequently, Officer Caribou "reopened the door," then stepped inside the building to what he described was the "common area." The evidence thus indicates that the building was unlocked, although Officer Caribou never explicitly stated this. Once inside, Officer Caribou observed a hallway, and to the right was a first-floor stairwell, where defendant and Turner

3

stood. Just after the door closed behind Officer Caribou, both defendant and Turner looked in his direction. Officer Caribou then saw that defendant had a firearm, which defendant promptly handed to Turner before fleeing to the second floor. At that point, Officer Caribou "probably" said "police, freeze." Defendant went into an apartment unit on the second floor and closed the door behind him. Turner, who was "locked out," froze and then threw the handgun on the second-stair landing. Turner was detained and handed off to Officer Pena, who had just arrived inside the building.

¶ 7     Officer Caribou recovered the loaded firearm, "a [.]380," and returned to the locked apartment unit. A female, whom Officer Caribou believed was defendant's girlfriend, opened the door. Officer Caribou arrested defendant, handcuffing him just outside the unit. Defendant was transported to the police station, where he received *Miranda* warnings. Only after that did officers learn defendant did not have a FOID or concealed carry card.

¶ 8     In response to the State's questions on cross-examination, Officer Caribou stated that he had not stopped or detained defendant before defendant and Turner initially fled into the building. At the police station, Officer Caribou also discovered that defendant resided at 7644 South Stewart Avenue.

¶ 9     The defense rested, and the State moved for a directed finding, arguing the defense had not met its burden of showing defendant's fourth amendment rights were violated. The State argued the weapon was recovered in the common area of the apartment building, where defendant had no privacy interest. Moreover, he was not a resident of the apartment unit, so he had no "standing."[3] Accordingly, there was no stop, search, or seizure of defendant that day.

---

[3]The term "standing" is no longer used and has been replaced with privacy expectation. *People v. Martin*, 2017 IL App (1st) 143255, ¶ 19.

¶ 10     The defense countered that there was in fact a stop but no reasonable suspicion to support it "from the inception." That is, the officer's several-second observation of the loitering group did not amount to reasonable suspicion to pursue defendant. Defense counsel emphasized the two individuals fled into the building even when officers had not yet announced their office. There was no suggestion that defendant and Turner knew police were in the vehicle or fled at the sight of the officers (a matter counsel conceded could lead to reasonable suspicion). The defense noted it was a crime-ridden area where one might expect flight at the sight of a slow-moving vehicle. In response to the judge's query, counsel stated that defendant's privacy rights began at the point that defendant entered the building. The defense elaborated that defendant entered the apartment unit and locked the door behind him, with his girlfriend eventually opening the door, all of which suggested that "would be enough to establish" defendant "may be a resident of this building." The defense thus asserted that defendant had a reasonable expectation of privacy in the building. The defense further argued that defendant was arrested prior to any knowledge as to the lack of a FOID or concealed carry card, so there was no probable cause for the arrest, and no exigent circumstances justifying entry into the building.

¶ 11     The court denied the State's motion for a directed verdict, declaring, "[a]t this point the petitioner has met [his] burden." The State then rested. Closing arguments largely reflected arguments already made. The State added that defendant had abandoned the weapon before entering the apartment unit. According to the State, even assuming for the sake of argument that defendant lived in the apartment, he still had no privacy interest in the building's common area. The State further argued that the police had probable cause to arrest defendant on seeing him expose his gun in public and tender it to someone else, contrary to the concealed carry law. Defense counsel, on the other hand, argued such actions occurring inside a residential apartment

5

complex did not give rise to probable cause for arrest without police first verifying whether defendant had gun licenses. The defense argued probable cause, instead, arose at the station, and the court agreed.

¶ 12    In conclusion, the court noted that there was no evidence of criminal activity from the outset "to suggest that this defendant should be stopped in any way." The court found that outside the apartment complex, defendant was not committing any crime, and there was no reason to believe he was committing a crime, yet police chased him anyway. The court stated that it was during the "pursuit" that police observed a weapon. However, given the laws permitting the public to possess guns outside the home via a FOID card and concealed carry license, the court ruled that when the police observed defendant with a handgun, they did not have probable cause to stop, seize, and then arrest defendant. The court noted that the gun was not fully exposed but rather found that "a moment in time in your hand should be partially concealed." The court, accordingly, found the arrest was unlawful and, further, that the gun recovered "subsequent to the violation of this defendant's constitutional rights" had to be suppressed under the exclusionary rule. The court granted defendant's motion to quash his arrest and suppress evidence.

¶ 13                                ANALYSIS

¶ 14    The State appeals from the trial court's order granting defendant's motion to suppress. On appeal, we give great deference to the trial court's findings of fact when ruling on a motion to suppress and will reverse those findings only if they are against the manifest weight of the evidence, *i.e.*, when the opposite conclusion is apparent or the findings are unreasonable, arbitrary, or not based on the evidence. *People v. Burns*, 2016 IL 118973, ¶ 15; *People v. Lomax*, 2012 IL App (1st) 103016, ¶ 19. However, a reviewing court remains free to undertake its own

assessment of the facts in relation to the issues presented and may draw its own conclusions when deciding what relief should be granted. *People v. Pitman*, 211 Ill. 2d 502, 512 (2004). As such, the trial court's legal ruling on whether the evidence should be suppressed is reviewed *de novo*. *People v. Bonilla*, 2018 IL 122484, ¶ 8. The question of law at issue in this case is whether a fourth amendment violation occurred when the police entered an unlocked multiunit apartment building without a warrant and, once inside the common area, observed defendant hand his friend a gun just before both fled upstairs, with defendant entering his purported apartment unit while the friend then discarded the gun. As set forth above, the State argues that for a variety of reasons, defendant had no reasonable expectation of privacy in the apartment building or apartment unit and there was no fourth amendment violation in this case.

¶ 15    The fourth amendment to the United States Constitution protects people from unreasonable searches and seizures, as does the Illinois Constitution's search and seizure provision. U.S. Const., amend. IV; Ill. Const. 1970, art. I, § 6; *People v. Smith*, 152 Ill. 2d 229, 244 (1992). To prevail on a motion to suppress evidence at the trial level, the defendant bears the burden of producing evidence and establishing a *prima facie* case that the search and seizure was unreasonable. *People v. Martin*, 2017 IL App (1st) 143255, ¶ 18; *People v. Carodine*, 374 Ill. App. 3d 16, 21 (2007). A *prima facie* showing means that the defendant has the primary responsibility for establishing the factual and legal bases for the motion to suppress. *People v. Brooks*, 2017 IL 121413, ¶ 22. However, once a defendant makes a *prima facie* showing of an illegal search and seizure, the burden then shifts to the State to produce evidence justifying the intrusion. *Martin*, 2017 IL App (1st) 143255, ¶ 18. However, the ultimate burden remains with the defendant. *Brooks*, 2017 IL 121413, ¶ 22.

¶ 16    Reasonableness under the fourth amendment generally requires a warrant supported by probable cause. *People v. Johnson*, 237 Ill. 2d 81, 89 (2010). A limited exception to the warrant requirement under *Terry v. Ohio*, 392 U.S. 1 (1968), permits a police officer to briefly stop (and therefore necessarily seize) a person for temporary questioning if he reasonably believes the person has committed, or is about to commit, a crime. *Johnson*, 237 Ill. 2d at 89, 91. Thus, a "seizure" occurs when an officer has in some way restrained a citizen's liberty so the person believes he is not free to leave. *People v. Thomas*, 198 Ill. 2d 103, 111 (2001). There are also encounters between police and private citizens that involve no coercion or detention and thus do not implicate the fourth amendment. *People v. Estrada*, 394 Ill. App. 3d 611, 616 (2009). In other words, if there is no unreasonable government intrusion, there is no search or seizure subject to the warrant clause of the fourth amendment. *People v. Woodrome*, 2013 IL App (4th) 130142, ¶ 19.

¶ 17                    *Initial Encounter: Reasonable Suspicion and Flight*

¶ 18    We begin our step-by-step analysis with the police officers' initial interaction with defendant. As set forth, police drove slowly down the street in an unmarked vehicle in the early evening hours. The area in question was known for narcotics, gangs, and drugs, and Officer Caribou testified police were patrolling due to the activities of two rival gangs. As the officers approached defendant and his cohort loitering on the sidewalk, defendant looked directly at the officers, then defendant and Turner fled into the apartment building and closed the door.[4] At that point, the police exited their vehicle, announced their office, and subsequently chased the men.

¶ 19    Although the trial court's ruling suggests the police officers were unjustified at the outset in chasing defendant and Turner, and defendant certainly set forth this argument below, an

---

[4]At oral arguments, defense counsel suggested that the police officers were essentially a block away when they observed the loitering group. We find this interpretation contrary to the record, where Officer Caribou testified that he was about "five feet" from the group when he made his observations.

individual's unprovoked flight on seeing police in an area known for crime is suggestive of wrongdoing and may justify police suspecting that individual of criminal activity, which warrants further investigation. See *Illinois v. Wardlow*, 528 U.S. 119, 124-25 (2000); *People v. Timmsen*, 2016 IL 118181, ¶¶ 15-19; *Thomas*, 198 Ill. 2d at 113. That the defendant's flight from police is susceptible to an innocent explanation does not vitiate the officer's right to detain that individual to resolve any ambiguity. *Wardlow*, 528 U.S. at 125. The determination of reasonable suspicion must be based on commonsense judgments and inferences about human behavior, and due weight must be given to the reasonable inferences the officer is entitled to draw from the facts in light of his experience. *Id.*; *People v. Sorenson*, 196 Ill. 2d 425, 433 (2001).

¶ 20     Here, the most rational inference from Officer Caribou's testimony is that the police presence and potential encounter is what prompted defendant's flight, giving rise to reasonable suspicion. See *People v. Jackson*, 2012 IL App (1st) 103300, ¶ 23. While defense counsel suggested that defendant and Turner could have mistaken the unmarked police vehicle for a potential drive-by shooter, for example, this innocent explanation does not lessen the officers' objective in resolving any ambiguity under the law. Although defendant bore the burden of production, he did not himself testify at the hearing, so we do not have any evidence of his subjective reason for fleeing. *Cf. In re Mario T.*, 376 Ill. App. 3d 468, 473 (2007) (finding the defendant established his *prima facie* case, where he testified that he was visiting his sister and thus doing nothing unlawful at the time he was stopped and frisked). In fact, defendant and Turner were the only two to flee among a group of four or five men, which weakens defense counsel's argument.

¶ 21     Regardless, defendant and Turner had already entered the building before the officers even announced their office and chased the two men. Contrary to the trial court's finding, there

was no fourth amendment stop or seizure implicated by the officers' pursuit of defendant, where there was no real encounter. See *Thomas*, 198 Ill. 2d at 112 (holding that a person must submit to a show of authority before that show of authority can constitute a seizure).

¶ 22                                *Police Entry Into Unlocked Apartment Building:*
                                    *Privacy Expectation in Apartment Common Area*

¶ 23     We turn to the next stage of the encounter, Officer Caribou's entry into the unlocked apartment building. Notably, the fourth amendment protects people, not places. *Pitman*, 211 Ill. 2d at 514. The extent to which the fourth amendment protects people may depend on where those people are. *Id.* As such, a defendant who objects to the search of a particular area must prove a legitimate expectation of privacy in the area searched, *i.e.*, an actual subjective expectation of privacy and one that society deems reasonable. *Katz v. United States*, 389 U.S. 347, 361 (1967) (Harlan, J., concurring); *Johnson*, 237 Ill. 2d at 90; *Carodine*, 374 Ill. App. 3d at 22. An expectation of privacy must have a source outside the fourth amendment by reference to concepts of real or personal property or to understandings that are recognized and permitted by society. *Pitman*, 211 Ill. 2d at 514. A "search" for purposes of the fourth amendment occurs when an expectation of privacy that society is prepared to consider reasonable is infringed. *Carodine*, 374 Ill. App. 3d at 22.

¶ 24     The State argues there was no reasonable expectation of privacy in the common area of the unlocked apartment building, which police were permitted to enter. The State further asserts that it was in this common area that police observed defendant "committing a criminal offense" and, as such, there was no "search" at issue. We are inclined to agree.

¶ 25     Historically, Illinois courts have found that there is no reasonable expectation of privacy in common areas of apartment buildings that are accessible to others. *Martin*, 2017 IL App (1st) 143255, ¶ 20 (cases cited therein). In that sense, *Smith*, 152 Ill. 2d 229, is instructive. There,

police officers entered an apartment building around 10 p.m. through an unlocked back door accessible to other tenants, the landlord, social guests, and other invitees. Officers, while standing in the hallway, then overheard a conversation coming from inside the defendant's apartment, wherein the defendant spoke with a raised voice and implicated himself in a murder under investigation. *Id.* at 240. Our supreme court observed that the officers had entered an unlocked common-area hallway where there was a diminished expectation of privacy and where they had a legal right to be. The *Smith* court also observed that "the officers used no artificial means to enhance their ability to hear defendant's conversation." *Id.* at 246. Based on all those factors taken together, the court held no fourth amendment "search" was implicated because the defendant did not have a reasonable expectation of privacy in his conversation. *Id.* at 245-46; see also *Carodine*, 374 Ill. App. 3d at 24 (holding the defendant did not have an objective expectation of privacy to the dryer vent because it was located in a common area where other tenants of the building, the landlord, and members of the public had access; therefore, the officer's opening and reaching inside of the vent was not a fourth amendment "search"). Building on *Smith*, it is well-settled that once an officer is legitimately on the property, in an area impliedly open to the public, he may properly observe any " 'evidence lying about in the open.' " *People v. Redman*, 386 Ill. App. 3d 409, 418-19 (2008). That is, a search does not occur when officers observe what is in open view. *Id.*

¶ 26    While defendant relies on a recent supreme court case, *Bonilla*, 2018 IL 122484,[5] we find it distinguishable. There, the police while acting on a tip regarding drug activity, entered the defendant's unlocked apartment building and then proceeded to the threshold of his third-floor unit doorway, where a drug-detection dog alerted officers to the presence of narcotics. It was on

_____

[5]In his opening brief, defendant relied on the appellate court's case in *People v. Bonilla*, 2017 IL App (3d) 160457, because the supreme court had not yet issued its opinion. Following its issuance, we granted defendant's motion for leave to cite the supreme court's *Bonilla* case as additional authority.

this basis that officers obtained a search warrant. *Id.* ¶ 3. The supreme court concluded the threshold of the apartment door constituted "curtilage" or an area immediately surrounding the defendant's home where his privacy expectations were most heightened, and this was a constitutionally protected area. *Id.* ¶ 27. The use of a drug-sniff dog at the threshold absent a warrant was an unlicensed physical intrusion that violated the defendant's fourth amendment rights. *Id.* ¶ 32. ¶

¶ 27    In reaching its conclusion, *Bonilla* relied on the well-established analytic framework in *Florida v. Jardines*, 569 U.S. 1 (2013).[6] There, police officers entered the front porch of defendant's home and used a trained narcotics dog to sniff at the door for drug evidence. They then used the positive drug-sniff to obtain a warrant and search the home. *Id.* at 3-4. The United States Supreme Court held that, first, the officers' investigation took place in a constitutionally protected area, as the court found the front porch clearly constituted cartilage (*id.* at 6-7), and, second, the conduct was an unlicensed physical intrusion not explicitly or implicitly permitted by the homeowner (*id.* at 7-9). It was therefore a "search" in violation of the fourth amendment. *Id.* at 11-12. Having disposed of the case under the "property-based" approach, the *Jardines* Court stated there was no need to also consider the additional factor of whether the police violated the defendant's expectation of privacy as set forth in the Supreme Court's earlier decision in *Katz*. *Id.* at 11.

¶ 28    *Bonilla* similarly relied on *Burns*, 2016 IL 118973, which had "nearly identical" facts and also employed the *Jardines* framework. *Bonilla*, 2018 IL 122484, ¶ 25. In *Burns*, our supreme

---

[6]*Bonilla* added that the Supreme Court's recent decision *Collins v. Virginia*, 584 U.S. ___, 138 S. Ct. 1663 (2018), further supported its determination. *Bonilla*, 2018 IL 122484, ¶ 28. In *Collins*, police entered a partially concealed portion of a driveway abutting the defendant's house to gather evidence (*Collins*, 584 U.S. at ___, 138 S. Ct. at 1668), and *Collins* concluded this physical intrusion invaded the defendant's fourth amendment right in the item searched and in the curtilage of his home (*id.* at ___, 138 S. Ct. at 1670-71).

court held that a warrantless middle-of-the-night use of a drug-detection dog at the defendant's apartment landing and door, located within a locked apartment building, violated the defendant's fourth amendment rights. *Burns*, 2016 IL 118973, ¶ 44. *Burns* noted the landing was clearly marked "with limited use and restricted access" such that it, and therefore the door threshold, constituted curtilage. *Id.* ¶ 39. The *Burns* court emphasized that the building entrances were locked and that "this case [was] distinguishable from situations that involve police conduct in common areas readily accessible to the public." *Id.* ¶ 41.

¶ 29    Building on *Burns*, *Bonilla* nonetheless held that even the unlocked status of the apartment building in its case was a distinction without difference, where the police clearly entered the apartment unit's curtilage (the door's threshold) to conduct the dog-sniff for drugs. The court further reasoned that the threshold was analogous to the front door in *Jardines*. In holding this, *Bonilla* observed that *Smith*, discussed above, was distinguishable as it concerned a "much different" scenario relating to a person's " 'reasonable expectation of privacy in things overheard by the police while standing in a common area of an unlocked apartment building.' " *Bonilla*, 2018 IL 122484, ¶ 42 (quoting *Burns*, 2016 IL 118973, ¶ 58). That is, a drug-sniff search was not the same as overhearing a conversation. Yet, *Bonilla* also clarified that *Smith* did not categorically stand for the proposition that "tenants have no expectation of privacy in common areas of either *locked* or *unlocked* apartment buildings." (Emphases added.) *Id.* This suggests that the analysis of what constitutes a constitutionally protected area and unlicensed physical intrusion in a multiunit building must be more fact-driven and nuanced. See *id.*; see also *Burns*, 2016 IL 118973, ¶ 98 (Garman, J., specially concurring) (noting that, not every police entry into the common area of an apartment building will be a search, and further, that shared

control over a multiunit building "directly impacts the license that may be granted to the police or public").

¶ 30    Viewing the particular facts in the present case, we conclude they are less like *Bonilla* and more like *Smith*, as defendant failed to produce evidence showing the officers' investigation took place in a constitutionally protected area or where he had a reasonable expectation of privacy or that it resulted in an unlicensed physical intrusion. Here, Officer Caribou entered the unlocked apartment building at a reasonable hour and stepped into what he described was the "common area" of the building. Our supreme court has expressly stated that the "term 'common area' suggests an area left open for common or public use," which necessarily negates any expectation of privacy. *People v. Janis*, 139 Ill. 2d 300, 318 (1990); *Smith*, 152 Ill. 2d at 245-46. Defendant did not present any testimony that the unlocked multiunit building was customarily locked or had a "no trespass" sign posted outside. Although Officer Caribou did not testify in detail about the building's entryway and composition, the only logical inference from his testimony is that he stood in a common area that was accessible to any other tenant, landlord, delivery person, or member of the public.[7] As such, we cannot say his entry was unlawful. See *Smith*, 152 Ill. 2d at 246.

¶ 31    We thus reject defendant's contention on appeal that the location where Officer Caribou observed the gun hand-off was curtilage, *i.e.*, the area immediately surrounding and associated with the home. The record evidence simply does not support that conclusion.[8] See *United States v. Dunn*, 480 U.S. 294, 301 (1987) (identifying factors for determining curtilage); *cf. Martin*, 2017 IL App (1st) 143255, ¶¶ 3-5, 28 (noting police committed fourth amendment violation by

---

[7]Police may even lawfully enter the curtilage as long as they do not exceed the scope of being there. That is, a police officer not armed with a warrant may approach a home and knock because that is " 'no more than any private citizen might do.' " *Jardines*, 569 U.S. at 8.

[8]Defendant argues the trial court found the common area of this apartment building constituted "curtilage," but we do not read such a factual finding in the record.

reaching inside the outer doorframe to obtain incriminating evidence, where the defendant's mother specifically testified at the motion to suppress hearing that the space between the interior and exterior doors of her two-flat building was private and not subject to trespassing with the exterior door normally locked). That is, there was no evidence that the area where Officer Caribou stood was clearly marked "with limited use and restricted access," such that it could constitute an extension of defendant's home. *Cf. Burns*, 2016 IL 118973, ¶ 39 (majority opinion). This similarly supports a conclusion that defendant had no privacy expectation in this particular area.

¶ 32　As to any claim of a physical intrusion, this was not a preplanned goal to gather incriminating evidence but the investigation of suspicious behavior in a crime-ridden neighborhood. And, no extra-sensory aids were used to observe defendant's hand-off of what police later discovered was an unlicensed handgun. Thus, the police did not exceed the scope of their license to be there. Accordingly, there was no fourth amendment search implicated simply by the police officers' entry into the common area of this unlocked building. That is because a search implies prying into hidden places for concealed items, and it is not a search to observe that which is in open view. *People v. Bridges*, 123 Ill. App. 2d 58, 67 (1970). Likewise, there was no seizure of defendant's person, since police had not then restrained defendant's liberty. Again, it was defendant's burden to show there was a search or seizure that violated his fourth amendment rights, and he did not fulfill that burden. See *Brooks*, 2017 IL 121413, ¶ 24.

¶ 33　　　　　　　　*Firearm Presence and Probable Cause to Arrest*

¶ 34　Turning to the next stage of the encounter, just after the door closed behind Officer Caribou, both defendant and Turner looked in his direction. Defendant handed Turner a firearm, then they fled upstairs to the second floor. Officer Caribou, who wore a vest bearing his star

number, name, and the word "police," testified that he "probably" said "police freeze." Defendant went into an apartment unit on the second floor and closed the door behind him. Turner, who was locked out, threw the handgun on the second-stair landing.

¶ 35    The State argues there was criminal activity afoot inside the apartment building, while defendant denies this claim. Defendant argued below and, in response to the State's appeal, now maintains that the police lacked reasonable suspicion or probable cause to believe he was committing a crime because possession of a gun is not *per se* illegal and the police failed to ask defendant whether he had a valid FOID card or concealed carry license prior to arresting him.

¶ 36    In *People v. Aguilar*, 2013 IL 112116, ¶ 21, our supreme court specifically held that the portion of the AUUW statute categorically banning use and possession of operable firearms for self-defense outside the home was unconstitutional. As such, by now it is well-established that "the second amendment right to keep and bear arms extends beyond the home," although such a right is subject to meaningful regulation. See *id.* ¶¶ 20-22. Under that meaningful regulation, in order to possess a handgun, a person must carry a FOID card issued in his name by the state police. 430 ILCS 65/2 (West 2014); *People v. Williams*, 266 Ill. App. 3d 752, 759-60 (1994) (a person in possession of a firearm must have a FOID card on his person because mere ownership of a FOID card by a person in possession of a firearm is insufficient to comply with the statute). Handguns cannot be transferred to another person unless that person "displays" a currently valid FOID card. 430 ILCS 65/3 (West 2014). A person desiring to transfer his firearm must first contact the state police to verify that the transferee has a valid FOID card. *Id.*

¶ 37    In addition, the Concealed Carry Act permits an individual to carry a concealed firearm on his person provided he has a valid FOID card. 430 ILCS 66/10, 25 (West 2014). A " '[c]oncealed firearm' " means "a loaded or unloaded handgun carried on or about a person

16

*completely or mostly concealed from view of the public.*" (Emphasis added.) *Id.* § 5. As a result,

the Concealed Carry Act implicitly prohibits individuals from carrying *fully exposed* handguns in

view of the public. A person with a concealed firearm must at all times possess his concealed

carry license, unless he is on his own land or in his abode or legal dwelling (*i.e.*, home) or acting

as an invitee on another person's land or in his home. *Id.* § 10(g); see also Black's Law

Dictionary (10th ed. 2014) (defining "abode" as a "home; a place of residence" and defining

"dwelling-house" as "a residence or abode"). The parties have not cited, nor has our research

revealed, an Illinois case demonstrating that the common area of a multiunit apartment building

constitutes "land," "abode," or a "legal dwelling," within the meaning of the Concealed Carry

Act. See *People v. McClure*, 218 Ill. 2d 375, 382 (2006) (to effect the legislature's intent, courts

should interpret the language of a statute according to its plain and ordinary meaning).[9] Thus, a

person must possess his concealed carry license while in the common area of a multiunit

apartment building, assuming concealed carry is permitted on that private property. See 430

ILCS 66/65 (West 2014).

¶ 38    In addition to defendant's aforementioned flight, here, defendant's actions on seeing

police of handing his gun to another person in the common area of an apartment building, which

was not his land or home, and then fleeing[10] the scene, in totality, are facts that gave police

---

[9]We decline defendant's invitation to characterize the common area of an apartment building as a "private residence," where it does not constitute the place where someone actually dwells or maintains his abode. See Black's Law Dictionary (10th ed. 2014) (defining "residence" as the "place where one actually lives" or a "house or other fixed abode"); see also 720 ILCS 5/19-4(a-5) (West 2014) (noting, for purposes of proving criminal trespass to a residence, the term "residence" does not include common recreational areas or lobbies in a multiunit residential building or complex).

[10]Section 10(h) of the Concealed Carry Act (430 ILCS 66/10(h) (West 2014)) provides that if an officer initiates an investigative stop of an individual, the officer may request his concealed carry license, and the individual must then disclose he is in possession of a concealed firearm. On the officer's request, the individual must present the license. *Id.* Here, as stated, there was no stop because defendant was fleeing the scene the entire time. That, too, is a fact adding to probable cause to believe that defendant was not in possession of the proper gun licenses.

probable cause to believe at the very least that defendant illegally possessed the gun. See *People v. Grant*, 2013 IL 112734, ¶ 11 (noting probable cause to arrest exists when the totality of the facts and circumstances known to the officer at the time are such that a reasonably cautious person would believe that the suspect is committing or has committed a crime); see also *Williams*, 266 Ill. App. 3d at 760 (the trier of fact could infer that the defendant who ran from police and threw his gun into the garbage did not have a FOID card while fleeing from police). The facts indicated a probability that defendant did not have the necessary gun licenses, that he had violated the FOID Card Act and the Concealed Carry Act with an illegal transfer to another individual, and that he had violated the Concealed Carry Act by exposing his gun in a semi-public place. See *People v. Wear*, 229 Ill. 2d 545, 564 (2008). That Officer Caribou had made multiple arrests for narcotics, gangs, and drugs in this neighborhood and was patrolling due to the activities of rival gangs at the time of this incident added to the totality of the circumstances justifying probable cause that defendant illegally possessed a firearm. See *People v. Rainey*, 302 Ill. App. 3d 1011, 1013 (1999) (noting, for probable cause, the totality of the circumstances known to the officer at the time of the arrest includes the officer's factual knowledge and his prior law enforcement experience).

¶ 39    Thus, the existence of a possible innocent explanation, like defendant's possession of the required gun licenses, did not necessarily negate probable cause. See *People v. Geier*, 407 Ill. App. 3d 553, 557 (2011). Likewise, the possibility that the owners of this residential apartment complex condoned concealed carry on their property did not lessen the probability that defendant did not in fact have the authority to possess a gun in the first place.[11] We note that to the extent

---

[11]Defendant notes that section 65(a-10) of the Concealed Carry Act (430 ILCS 66/65(a-10) (West 2014)) states that an owner of private real property "of any type may prohibit the carrying of concealed firearms" on his property but must post the sign conspicuously at the entrance. Under section 65(a-10), this requirement does not apply to a "private residence." *Id.* Defendant argues the absence of any

the trial court found the gun continued to be "partially concealed" when defendant handed it to Turner, such a finding has no basis in the record and is an unreasonable inference from Officer Caribou's testimony and, thus, is against the manifest weight of the evidence.

¶ 40     We wish to emphasize that under the current legal landscape, police cannot simply assume a person who possesses a firearm outside the home is involved in criminal activity. Likewise, they cannot use a firearm in partial view, such as a semi-exposed gun protruding from the pant pocket of a person on a public street, alone as probable cause to arrest an individual for illegal possession without first identifying whether the individual has the necessary licenses. We thus caution against an "arrest first, determine licensure later" method of police patrol. However, as set forth above, mere gun possession was not the scenario that presented itself to police in this case. The totality of the circumstances suggested criminal activity.

¶ 41                         *Abandonment of the Firearm and Arrest*

¶ 42     Regardless, given the sequence of events in this case, we agree with the State that defendant had abandoned his weapon before police even collected the gun and arrested defendant. Notably, abandoned property is not subject to fourth amendment protection since no one can have a reasonable expectation of privacy in an abandoned item. *Pitman*, 211 Ill. 2d at 519-20; see also *Abel v. United States*, 362 U.S. 217, 241 (1960) (noting there is nothing unlawful in the government's appropriation of abandoned property). As such, abandoned property may be searched and seized without probable cause. *People v. Sutherland*, 223 Ill. 2d 187, 230 (2006). For abandonment, the State must demonstrate by a preponderance of the evidence that the defendant's voluntary words or conduct would lead a reasonable person in the

evidence indicating such a sign existed in this case, by default, meant that police had to assume carrying a concealed firearm in this apartment complex was permissible and therefore defendant had the proper license. As set forth above, we reject defendant's red-herring argument. Defendant also relies extensively on *People v. Horton*, but that case has been vacated with directions by the supreme court. *People v. Horton*, 2017 IL App (1st) 142019, *vacated*, No. 122461 (Ill. Nov. 22, 2017).

search officer's position to believe that the defendant relinquished his property interest in the item searched or seized. *Pitman*, 211 Ill. 2d at 520. As this is an objective test, it matters not if the defendant desires to later reclaim the item. *Id.* What matters is the external manifestations of the defendant's intent as judged by a reasonable person who possesses the same knowledge available to the police. *Id.* " 'We look at the totality of the circumstances, but pay particular attention to explicit denials of ownership and to any physical relinquishment of the property.' " *Id.* (quoting *United States v. Basinski*, 226 F.3d 829, 836-37 (7th Cir. 2000)).

¶ 43    Here, contrary to defendant's suggestion, defendant did not thoughtfully hand his gun to Turner for safekeeping with strict directions or indicate that he would later reclaim the gun. *Cf. Basinski*, 226 F.3d at 837-38 (noting where the criminal entrusted his locked briefcase containing incriminating evidence to his lifelong friend to hide it on the friend's remote private property in a secure state and to subsequently destroy the briefcase, the criminal did not intend to abandon the briefcase). Rather, this is the quintessential abandoned property case, characterized by "a fleeing defendant who relinquishes an object *** because discarding the item might make it easier for him to later claim that he never possessed it." *Id.* at 837. In this case, defendant physically relinquished his property to Turner, while knowing police were in hot pursuit, and then shut Turner out of defendant's purported apartment unit. Defendant thus exhibited he did not wish to be caught in possession of the gun. Turner then discarded the gun in an area where anyone could have retrieved it. The total circumstances indicate a reasonable person in Officer Caribou's position would believe that defendant had relinquished his possessory interest in the gun that police later seized. It was more likely true than not that defendant abandoned the handgun.

¶ 44    Because no search or seizure occurs when police take hold of an abandoned item, the validity of the arrest is irrelevant. See *People v. Hoskins*, 101 Ill. 2d 209, 220 (1984); *People v.*

*Grant*, 38 Ill. App. 3d 62, 68 (1976); *Bridges*, 123 Ill. App. 2d at 67. That is, the evidence here was obtained prior to and independent of defendant's arrest, and as such, the arguments of counsel as to the legality of the arrest merit no further consideration. See *Bridges*, 123 Ill. App. 2d at 67. Accordingly, the trial court's conclusion that the gun was the "fruit of the poisonous tree" was demonstrably incorrect. See *Johnson*, 237 Ill. 2d at 92 (in order for evidence obtained from an illegal arrest to be excluded, there must be some causal nexus between the illegal police activity and the disputed evidence). In truth, as the State concurred at oral argument, this scenario is more akin to a situation where there is no fruit from an "unplanted tree." See *Burns*, 2016 IL 118973, ¶ 47 (describing the fruit-of-the-poisonous-tree metaphor).

¶ 45     Regardless, where the offense can be said to have been committed in the presence of an officer, it has generally been held that the officer may enter the premises without a warrant for the purpose of making a warrantless arrest. *People v. Eichelberger*, 91 Ill. 2d 359, 369 (1982); see also *Wear*, 229 Ill. 2d at 571 (noting an officer's warrantless nonconsensual entry into the defendant's residence was excused under doctrine of hot pursuit, where at the very least the officer had probable cause to arrest at the threshold of the defendant's home). Given that defendant's actions provided police with probable cause to believe he was committing a felony in their presence, the officers rightfully entered defendant's alleged apartment unit to make a warrantless arrest, even assuming the apartment unit was defendant's and his "girlfriend" did not lawfully consent to the police entering. See *Wear*, 229 Ill. 2d at 571.

¶ 46     Based on the foregoing, defendant abandoned his handgun without implicating a fourth amendment search or seizure. Alternatively, police acquired probable cause to sustain defendant's arrest in the apartment unit after observing him hand off the gun and flee. As noted throughout this case, it was defendant's initial burden to show a *prima facie* case of illegal search

and seizure, and he failed. See *Martin*, 2017 IL App (1st) 143255, ¶ 18; see also *People v. Relwani*, 2019 IL 123385, ¶ 18 (noting that a *prima facie* case is " '[a] party's production of enough evidence to allow the fact-trier to infer the fact at issue and rule in the party's favor' " (quoting Black's Law Dictionary 1310 (9th ed. 2009))).

¶ 47                    *Defendant's Expectation of Privacy in the Apartment Unit*

¶ 48    Finally, even assuming police conducted a search or seizure in violation of defendant's fourth amendment rights, defendant would fare no better because he failed to establish a reasonable expectation of privacy in the actual apartment unit and, thus, in the building itself. The fourth amendment's constitutional safeguards are personal protections that may not be vicariously asserted and, thus, not every aggrieved defendant can seek to exclude evidence allegedly obtained in violation of the fourth amendment. *People v. Ervin*, 269 Ill. App. 3d 141, 146 (1994). Again, the defendant bears the burden of establishing that he held a reasonable expectation of privacy, *i.e.*, one that society is prepared to recognize as reasonable, in the place searched or the property seized. *Id.* Factors for determining a reasonable expectation of privacy include whether the defendant was legitimately present in the area searched, his possessory interest in the area or property seized, his prior use of the area searched or property seized, his ability to control or exclude others' use of the property, and his subjective expectation of privacy. *Pitman*, 211 Ill. 2d at 520-21.

¶ 49    Here, defense counsel noted defendant had entered the apartment unit, locking the door behind him, and the woman inside (who was his supposed girlfriend) eventually reopened the door for the police. Defense counsel thus implicitly argued that defendant maintained a possessory interest in the apartment unit and the ability to control or exclude others from the

property. The trial court credited this argument as establishing defendant's reasonable expectation of privacy.

¶ 50     The State now argues this evidence was insufficient, especially where it showed defendant did not reside at that address and his relationship with the woman who answered the door was merely assumed. Defendant counters that, with the trial court's finding, the burden of production then shifted to the State. He argues the State, however, failed to rebut the evidence and is now "trying to game the system" and engaging in "prejudicial sandbagging" by raising the matter on appeal. We disagree.

¶ 51     In addition to the above factors, it is well-established that while an overnight guest in a home may claim the protection of the fourth amendment, one who is *merely present* with the consent of the householder may not. *Minnesota v. Carter*, 525 U.S. 83, 90 (1998); *People v. Williams*, 186 Ill. App. 3d 467, 472 (1989) ("Merely because the defendant is occasionally on the premises as a guest or invitee, and is on the premises at the time of the allegedly illegal search, does not confer standing."). In *Ervin*, for example, this court held that the defendant's weekly presence as a guest in his ex-wife's home was insufficient to establish a reasonable expectation of privacy, where he did not reside there, was not even a daily visitor, did not store clothing there, and did not spend nights there. *Ervin*, 269 Ill. App. 3d 141. This was in spite of him listing her address on his driver's license and other identification. See also *People v. Parker*, 312 Ill. App. 3d 607, 613 (2000) (noting, in Illinois, the storage of personal effects and other *indicia* of residence demonstrate an expectation of privacy in non-overnight guests); *Williams*, 186 Ill. App. 3d at 471 (concluding the defendant had no reasonable expectation of privacy in his girlfriend's apartment where he did not live there, spent only one night a week there, did not take meals or keep clothes there, and had his mailing address elsewhere).

¶ 52    The evidence in this case established defendant's presence in and access to the apartment unit, but it did not establish whether the apartment was itself locked before he entered, how often he was in the apartment, whether he planned to stay there for more than a brief period of time, or whether he kept any possessions there. The evidence therefore was insufficient to demonstrate he had a reasonable expectation of privacy in the actual apartment unit and in the apartment building itself. To the extent the trial court found otherwise, its finding was against the manifest weight of the evidence. The record also reveals that the State argued in its motion for a directed finding the issue of defendant's privacy interest in the unit and the matter was not waived. In any event, this particular issue does not warrant remand for a continuation of the suppression hearing because, as stated, there was no fourth amendment search or seizure implicated. Thus, defendant cannot ultimately succeed on a motion to suppress.

¶ 53                               CONCLUSION

¶ 54    For the reasons stated, we reverse the judgment of the circuit court granting defendant's motion to quash his arrest and suppress evidence. We remand the case for further proceedings consistent with this order.

¶ 55    Reversed and remanded.