2020 IL App (1st) 172687-U

No. 1-17-2687

September 9, 2020

Third Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 15 CR 10490 |
| | ) | |
| TRAVILLE SMITH, | ) | Honorable |
| | ) | Kevin M. Sheehan, |
| Defendant-Appellant. | ) | Judge Presiding. |

PRESIDING JUSTICE HOWSE delivered the judgment of the court.
Justices McBride and Ellis concurred in the judgment.

**ORDER**

¶ 1    *Held*:  Defendant's trial counsel was not ineffective for failing to file a motion to quash arrest and suppress evidence where the arresting officers had probable cause to arrest defendant.

¶ 2    Following a jury trial, defendant Traville Smith was convicted of armed habitual criminal (720 ILCS 5/24-1.7(a) (West 2014)) and sentenced to 10 years' imprisonment. On appeal, defendant argues his trial counsel was ineffective for failing to file a motion to quash arrest and suppress evidence where the police officers arrested defendant based solely on his possession of a

firearm, without probable cause or reasonable suspicion that his possession of the weapon was unlawful, and they improperly used their unauthorized seizure of defendant to extract a statement from him and discover his criminal history to prove he committed a crime. We affirm.

¶ 3    Defendant was charged with one count of armed habitual criminal, two counts of unlawful use or possession of a weapon by a felon, and four counts of aggravated unlawful use of a weapon arising from his possession of a firearm on June 19, 2015. The State proceeded only on the armed habitual criminal count.

¶ 4    At trial, Chicago police officer Kent Elmer testified that on June 19, 2015, he was assigned to a tactical team, "assigned a certain area of the district that has a recent spike in violence or narcotic sales." He was in civilian dress, wearing a police vest, insignia, name tag, and duty belt with police-issued equipment, and driving an unmarked squad car while on routine patrol in that area with his partner Chicago police officer Steve Barsch. On the 5400 block of South Laflin Street in Chicago, at approximately 11:18 a.m., he observed a group of six people "loitering" in front of a vacant building near a parked car. Elmer identified defendant in court as one of the people he saw.

¶ 5    Elmer saw defendant standing near the driver's side rear door of the car, and noticed defendant was "securing" a "bulge" in the front of his waistband while leaning into an open window in the car. In his eight years as a police officer, Elmer had seen people reach toward their waistband and "manipulate" an item. Seeing defendant do this caused Elmer "alarm." At that point, the officers decided, "due to the totality of the circumstances," to exit their vehicle and conduct a field interview. "Immediately" upon the officers exiting the vehicle, approximately 10 feet away

from the group, defendant "grabbed" the bulge in his waistband and fled on foot. Elmer then announced his office and pursued defendant on foot while Barsch pursued by car.

¶ 6     Running behind defendant, Elmer saw one of defendant's hands clutching the front waistband area of his body as he was running. He followed defendant to Garfield Boulevard and then to the 5400 block of Bishop Street, where he saw defendant remove a black handgun from the front of his body with the hand which had been clutching that area and throw the gun to the ground. From approximately 15 feet away, nothing obstructed Elmer's view and he heard the gun make a "clunk" sound when it fell on the grass. Elmer recovered the gun within approximately three seconds of seeing defendant drop it and continued pursuing defendant. Defendant then ran through the alleys behind Bishop Street, and a gangway westbound between two houses before he emerged onto Bishop Street once more and fell to the ground. When defendant fell, Elmer "detained" him. Elmer "ordered him on his stomach" until Barsch arrived with the vehicle. The officers handcuffed defendant and placed him into custody.

¶ 7     The handgun Elmer recovered was "a Lorcin arms nine-millimeter black semi-automatic" loaded with 14 bullets, including one in the chamber. The gun remained in Elmer's constant care, custody, and control until he reached the police station. Elmer identified the gun and ammunition he recovered in court.

¶ 8     After the officers placed defendant in custody, they transported him to the police station, where the defendant "related to [them] that [they] caught him and that he refuses to be a victim." Barsch inventoried the gun and placed it in the inventory cabinet. The gun and ammunition were entered into evidence.

¶ 9    On cross-examination, Elmer stated he recognized the group of people due to his "driving down that street before" but did not know any of their residential addresses. It was possible that one or more of those people could have lived on that block. After Elmer pursued defendant on foot, he did not see Barsch in the vehicle until he had already detained defendant. Elmer stated that, while he observed defendant drop the handgun in an open field which was next to a house, he wrote in his incident report that he observed defendant drop a gun in a gangway, which to him meant the side of a house. Elmer acknowledged that he did not have gloves on when he picked up the gun although he had been trained in how to process crime scenes and preserve evidence. Elmer's vehicle was not equipped with a dashboard camera, nor was he equipped with a body camera. Elmer stated "[i]t is routine" to question defendants regarding potential medical conditions, but he did not recall defendant's responses.

¶ 10   On redirect examination, Elmer testified that he never lost sight of defendant from when he first saw him to detaining him. Elmer did not wait to pick up the gun until he had gloves because he was the only officer present and he had "to weigh leaving the crime scene or retrieving the handgun without gloves."

¶ 11   On recross examination, Elmer stated, at the time he retrieved the handgun, he did not know whether it was loaded, the safety was on, or if it was functioning correctly. He picked it up by the barrel and kept running with it. When Elmer detained defendant, he ordered him to turn around "on his belly" and, after defendant complied, Elmer placed a knee on his back, waiting for his partner to arrive, who then placed defendant in handcuffs.

¶ 12   Chicago police sergeant Steve Barsch testified he was working with Elmer as part of the tactical team on June 19, 2015. They were dressed in jeans and t-shirts, wearing their vests with

stars and name tags, as well as their duty belts, driving in an unmarked police car on the 5400 block of South Laflin Street. Around 11:18 that morning, they saw a group of people, including defendant, "hanging out" in front of an abandoned building. When the officers got closer, Barsch saw defendant move his hand to his waistband and "manipulat[e] a bulge in his front while moving towards [a] parked car." Barsch indicated this to the court by placing his right hand by his waistband.

¶ 13    Barsch and Elmer decided to stop their vehicle when they were approximately 10 to 15 feet away from defendant. As they exited the vehicle, defendant fled on foot, running south. Elmer gave chase on foot while Barsch moved to the driver's seat and followed in the vehicle. Approximately one block away from where he first saw defendant, Barsch saw Elmer holding a knee to defendant's back. Elmer was holding a gun in his hand by the barrel or frame, so Barsch knew it was not Elmer's weapon. When Barsch pulled over, he assisted Elmer in handcuffing defendant, and they transported him to the police station. Barsch read defendant his *Miranda* rights, and defendant stated he understood. Defendant then stated something to the effect of "he had it" and he "did not want to be a victim" and "y'all got me." Defendant's statement was not recorded. Barsch inventoried the firearm he received from Elmer, which he identified in court.

¶ 14    On cross-examination, Barsch acknowledged he did not know who owned the building in front of which the people had been gathered. The squad car Elmer and Barsch were using had "M [license] plates" which designated it as a municipal vehicle. He and Elmer had exited their vehicle but not approached the group yet when defendant immediately fled on foot. Everyone else in the group did not also flee. Barsch stated that he never saw defendant holding a gun and did not recall what defendant or any of the other people with defendant had been wearing that day. On redirect

examination, Barsch testified he was not paying attention to the other people who were present in front of the building as his only focus was on defendant at the time, but he did not recall the other people "taking off."

¶ 15    The parties stipulated that defendant had previously been convicted of two qualifying felony offenses. The court denied defendant's motion for a directed verdict.

¶ 16    Defendant testified he had prior convictions for possession of a controlled substance and unlawful use of a weapon. On June 19, 2015, at approximately 11:00 a.m., he was in the 5400 block of South Laflin Street in Chicago walking with two other people to a gas station. Defendant did not have a firearm. Police officers arrived in a car and, when they got out of the car, defendant ran away because he "was on parole and so was the guy [he] was with, which is illegal." Defendant clarified that the reason he ran was because he believed he was in violation of his parole. At the time, defendant had a medical condition, inguinal hernia, which caused him pain while running, so he was holding his "scrotum area" rather than his waistband. Inguinal hernia makes the scrotum appear "inflated," which defendant described as "it kind of looked like I had, like, a softball in my pants." This hernia had been treated since defendant was arrested.

¶ 17    Defendant ran a block away to a vacant lot where a police officer chased him. Defendant did not drop a gun in the vacant lot. Defendant was about five or six houses ahead of the police officer, but the officer caught up with him because defendant was in "too much pain," had to stop running, and fell down. At that point, the officers arrested defendant, putting him in handcuffs and placing him in a car. Defendant never possessed or saw a gun at any point that day. At the station, defendant never made any statement to police officers.

¶ 18    On cross-examination, defendant stated his scrotum was enlarged "pretty close" to his waist on June 15, 2015, and was about the size of a grapefruit. Defendant did not run between houses, but ran through several vacant lots, until he was arrested. When defendant was transported to the police station, the police officers never read him his *Miranda* rights and never asked him his version of events. At the station, the officers who had arrested him asked him what was in his pants "because it was so large."  He told them he had an inflated hernia. They never offered to take him to the hospital. Defendant stated when he had given up running, Elmer caught up to him and told him to get on the ground. Elmer put his knee on top of defendant but had nothing in his hands at the time. The officers found a gun after his arrest, but defendant never had it.

¶ 19    Officer Barsch testified in rebuttal that he read defendant his *Miranda* rights, after which defendant made a statement at the police station. Defendant never complained of any medical conditions and never told Barsch he had a hernia. Nor did Barsch observe defendant to have a "bulging testicle that came up near his waist region." Had defendant complained of any medical issues, Barsch would have called EMS or brought him to the emergency room. Defendant was never taken for any sort of treatment, although he was given the opportunity to express any medical concerns.

¶ 20    The jury found defendant guilty of armed habitual criminal. The court denied defendant's motion and supplemental motion for a new trial and sentenced defendant to 10 years' imprisonment.

¶ 21    On appeal, defendant argues this court should reverse his conviction outright or remand for further proceedings because his trial counsel was ineffective for failing to move to quash defendant's arrest and suppress his subsequent statement to Officers Elmer and Barsch and the

criminal history gathered after his arrest, where the officers arrested him without probable cause or even reasonable suspicion to believe that his possession of the gun was unlawful.

¶ 22    As an initial matter, the State argues this court "may wish" to decline review of this issue which may be better suited for postconviction review where a more complete record could be developed. Because counsel did not file a motion to quash arrest and suppress evidence, the court held no hearing regarding whether the evidence showed the officers had probable cause to arrest defendant. Further, at trial the State was only concerned with proving that defendant committed the charged offense, not with establishing a factual basis demonstrating the officers' probable cause to arrest. See *People v. Burnett*, 2019 IL App (1st) 163018, ¶ 13-14 (noting the circumstances of the case did not permit the court to meaningfully review the defendant's claim of ineffective assistance of counsel for failure to file motion to quash arrest); *People v. Evans*, 2015 IL App (1st) 130991, ¶ 34 (concluding the record in the case was devoid of factual findings relevant to the appropriateness of the police officers' actions surrounding defendant's arrest and, therefore, declining to consider the defendant's claim of ineffective assistance of counsel in failing to file a motion to suppress evidence).

¶ 23    As our Supreme Court stated in *People v. Veach*, 2017 IL 120649, ¶ 46, "ineffective assistance of counsel claims may sometimes be better suited to collateral proceedings but only when the record is incomplete or inadequate for resolving the claim." *Veach*, 2017 IL 120649, ¶ 46. Thus, we must "carefully consider each ineffective assistance of counsel claim on a case-by-case basis" (*Id*., ¶ 48) "to determine whether the circumstances permit us to adequately address a defendant's ineffective assistance of counsel claim on direct review." *Burnett*, 2019 IL App (1st) 163018, ¶ 13. In this case, we find the evidence presented at trial is sufficient for analyzing the

question of whether the police officers had probable cause to arrest defendant. Officer Elmer in particular testified regarding defendant's flight and viewing defendant throw a gun away, which comprised the basis for the charge against him. Although testimony regarding the officer's suspicions would have been presented at a suppression hearing, much of the testimony at trial was of the same type as at a potential suppression hearing (see *People v. Henderson*, 2013 IL 114040, ¶ 22), and we view the record as adequately developed for this court to address defendant's claims without the need for speculation. Accordingly, we turn to the merits.

¶ 24 Defendant contends the police illegally arrested him based solely upon his flight and "manipulation" of his waistband without probable cause to believe a crime was being committed. He argues a motion to quash his arrest and suppress the evidence gathered as a result of his illegal arrest would therefore have been successful and, without that evidence, the State could not prove he was guilty. He argues counsel therefore was ineffective for not filing a motion to quash arrest and suppress evidence. The State responds the police officers had probable cause for defendant's arrest where defendant discarded a firearm during his flight, so any motion to quash arrest and suppress evidence would have been unsuccessful.

¶ 25 We review ineffective assistance of counsel claims using the two-part test set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). *People v. Manning*, 241 Ill. 2d 319, 326 (2011). To establish a claim of ineffective assistance of counsel, a defendant must demonstrate both that (1) counsel's performance was objectively unreasonable under prevailing professional norms and (2) the deficient performance prejudiced defendant. *Veach*, 2017 IL 120649, ¶ 30. A defendant must satisfy both prongs of the *Strickland* test to raise a successful claim for ineffective assistance of counsel. *Id*. If a reviewing court finds defendant suffered no prejudice from counsel's acts or

omissions, it need not determine whether counsel's performance was objectively unreasonable under the first prong of the test. *People v. Ceja*, 204 Ill. 2d 332, 358 (2003). We review ineffective assistance of counsel claims *de novo*. *People v. Demus*, 2016 IL App (1st) 140420, ¶ 21.

¶ 26    Trial counsel's decision regarding whether to file a motion to quash arrest and suppress evidence is generally a matter of trial strategy, which is afforded great deference. *People v. Spann*, 332 Ill. App. 3d 425, 432 (2002). Trial counsel "enjoys the strong presumption that failure to challenge the validity of the defendant's arrest or to move to exclude evidence was proper." *Id.* In order to overcome that presumption and establish prejudice, defendant must show the unargued suppression motion is meritorious, and that a reasonable probability exists that the trial's outcome would have been different had the evidence be suppressed. *Henderson*, 2013 IL 114040, ¶ 15. Accordingly, in order to find defendant received ineffective assistance of counsel for his trial counsel's failure to file a motion to quash arrest and suppress evidence, defendant must show the motion would have been granted.

¶ 27    We find defendant has not met this burden. Under the fourth amendment to the United States Constitution, people have the right to be secure against unreasonable searches and seizures. U.S. Const., amend. IV. Further, "[i]t is well settled that not every encounter between the police and a private citizen results in a seizure." *People v. Luedemann*, 222 Ill. 2d 530, 544 (2006). Courts have thus divided encounters between citizens and police into three categories: (1) arrests, which must be supported by probable cause; (2) *Terry* stops, which must be supported by reasonable, articulable suspicion of criminal activity; and (3) encounters that involve no coercion or detention and do not implicate fourth amendment concerns. *Id.*

¶ 28    Defendant here challenges his arrest, which occurred when he complied with Elmer's order

to lie on his stomach, where Elmo held him until defendant was handcuffed. Probable cause to arrest exists when "the facts known to the officer at the time of the arrest are sufficient to lead a reasonably cautious person to believe the arrestee has committed a crime," under the totality of the circumstances at the time of the arrest. *People v. Wear*, 229 Ill. 2d 545, 563-64 (2008). "The standard for determining whether probable cause is present is probability of criminal activity, rather than showing proof beyond a reasonable doubt." *Id*. at 564.

¶ 29    Defendant argues that the police officers illegally seized him based on his flight and manipulation of a "bulge" in his waistband before deciding to interview defendant. He asserts they lacked reasonable, articulable suspicion to initiate a *Terry* stop, let alone probable cause to arrest him. He further argues even if Elmer believed defendant had a gun at his waist, this is not presumptively illegal as is lawful under the second amendment to possess a gun in Illinois. See *People v. Aguilar*, 2013 IL 112116, ¶ 21. Defendant argues that, in light of *Aguilar*, a police officer merely viewing a person's possession of a gun does not provide probable cause to arrest that person.

¶ 30    As defendant notes, his ultimate seizure took place when, after he fell on the ground after running from Elmer, he obeyed Elmer's order to lay on his stomach and stayed there until he was handcuffed, thereby submitting to the police officers' authority. See *People v. Thomas*, 198 Ill. 2d 103, 111-112 (2001). We do not agree that the officers had no probable cause to arrest defendant, as the officers' decision to arrest was based on more than seeing a suspicious bulge on defendant's person.

¶ 31    Elmer testified he and Barsch were assigned to an area with a recent spike in violence or narcotic-related crimes. Due to his eight years' experience as a police officer, defendant's

manipulation of a bulge at his waist caused Elmer "alarm," leading the officers to decide to conduct a field interview under the totality of the circumstances. As soon as they exited their vehicle, before they even began to approach defendant, he ran off, circling the block in ostensibly evasive maneuvers, clutching the front waistband area of his body while Elmer pursued him on foot. "[U]nprovoked flight on seeing police in an area known for crime is suggestive of wrongdoing and may justify police suspecting that individual of criminal activity, which warrants further investigation." *Thomas*, 2019 IL App (1st) 170474, ¶ 19 (citing *Illinois v. Wardlow*, 528 U.S. 119, 124-25 (2000)). The fact that defendant's flight from police is susceptible to an innocent explanation, here that he thought associating with another parolee violated his own parole, does not vitiate the officers' right to detain the individual to resolve any ambiguity. *Id.*

¶ 32    Then, during defendant's flight, Elmer witnessed defendant remove a handgun from his waistband and drop it to the ground. Disposal of a handgun is a fact which can contribute to finding probable cause that defendant illegally possessed the handgun. *Thomas*, 2019 IL App (1st) 170474, ¶¶ 38-39 (holding the defendant's flight from police officers and handoff of a handgun to another person were facts taken in totality that "gave police probable cause to believe at the very least" the defendant illegally possessed the handgun).

¶ 33    Defendant is correct that, under *Aguilar*, the right to bear arms extends beyond the home. *Aguilar*, 2013 IL 112116, ¶ 20. However, that right is "subject to meaningful regulation." *Id.*, ¶ 21. Under that meaningful regulation, in order to possess a handgun, a person must carry a FOID card issued in his name by state police (430 ILCS 65/2 (West 2014)). *Thomas*, 2019 IL App (1st) 170474, ¶ 36. Further, under the Concealed Carry Act (430 ILCS 66/10 (West 2014)), an individual may carry a concealed firearm on his person provided he has a valid FOID card. *Id.*, ¶ 37. A

"concealed firearm" means a firearm "carried on or about a person completely or mostly concealed from the view of the public." 430 ILCS 66/5 (2014). Here, defendant openly took out his firearm, threw it away, and continued running. Not only did his openly wielding his gun violate the Concealed Carry Act (*Thomas*, 2019 IL App (1st) 170474, ¶ 39), he attempted to get rid of the gun as he was fleeing from police. These facts gave police probable cause to believe, at the very least, that defendant illegally possessed the gun, *i.e.* that there was a probability that defendant did not have the necessary gun licenses and that he violated the Concealed Carry Act if he did. *See id.*, ¶¶ 38-39.

¶ 34    Given *Aguilar* and the licensing acts, "police cannot simply assume a person who possesses a firearm outside the home is involved in criminal activity. *Id.*, ¶ 40. However, the totality of the circumstances here indicates more than mere gun possession. Taken together, Elmer's police experience, defendant's immediate unprovoked flight upon seeing police officers in an area with a recent spike in violence or narcotic-related crimes, and public display and then disposal of a firearm would lead a reasonably cautious person to believe defendant was committing or had committed a crime, thereby establishing probable cause to arrest him. See *id.*, ¶¶ 37-40.

¶ 35    Because the evidence shows police officers had probable cause to arrest defendant under the totality of the circumstances, any motion to quash arrest and suppress evidence would not have been successful. See *People v. Grant*, 2013 IL 112734, ¶ 23. Therefore, defendant did not suffer prejudice from his trial counsel's failure to file a motion to quash arrest and suppress evidence, and we find his trial counsel was not ineffective for failing to file the motion. *See Ceja*, 204 Ill. 2d at 358. Further, because we find defendant's counsel was not ineffective for failing to file the

motion, we need not address defendant's argument that counsel was ineffective in failing to move to suppress defendant's criminal history and statement.

¶ 36     For the foregoing reasons, we affirm the judgment of the circuit court of Cook County.

¶ 37     Affirmed.