2019 IL App (1st) 170801-U

No. 1-17-0801

Order filed November 19, 2019

Second Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 16 CR 11810 |
| | ) | |
| TERRY PRUITT, | ) | Honorable |
| | ) | Thaddeus L. Wilson, |
| Defendant-Appellant. | ) | Judge, presiding. |

PRESIDING JUSTICE FITZGERALD SMITH delivered the judgment of the court. Justices Pucinski and Coghlan concurred in the judgment.

**ORDER**

¶ 1 *Held*: We affirm defendant's conviction, concluding (1) defendant was not deprived of his right to effective assistance of counsel where trial counsel did not file a motion to quash arrest and suppress evidence; (2) the trial court did not err by failing to explain its reasoning behind imposing a nine-year sentence; and (3) defendant's nine-year prison sentence was not excessive.

¶ 2    Following a bench trial, the court found defendant guilty of armed habitual criminal, two counts of unlawful use of weapon by a felon (UUWF), and two counts of aggravated unlawful use of a weapon (AUUW), and, after merging the counts into the armed habitual criminal conviction, sentenced defendant to nine years' imprisonment. Defendant appeals, arguing (1) he was denied the effective assistance of counsel as a result of his trial counsel's failure to file a motion to quash arrest and suppress evidence; (2) the trial court erred by failing to explain its reasoning for imposing the nine-year sentence; and (3) his nine-year prison sentence was excessive. We affirm.

¶ 3    The State charged defendant by indictment with being an armed habitual criminal (720 ILCS 5/24-1.7(a) (West 2016)), two counts of UUWF (720 ILCS 5/24-1.1(a) (West 2016)), and two counts of AUUW (720 ILCS 5/24-1.6(a)(1), (3)(A-5), (3)(C) (West 2016)), based on his possession of a loaded firearm. The matter proceeded to bench trial at which the following evidence was presented.

¶ 4    Sergeant Emmett McClendon testified that at approximately 12:41 p.m. on July 19, 2016, he drove an unmarked police vehicle to a residence located in the 7200 block of South Hermitage Avenue in Chicago. He was wearing civilian clothes, body armor, his star around his neck, and his duty belt. When he arrived at the residence, he observed defendant, whom he identified in open court, sitting on the porch with two or three other men.

¶ 5    McClendon exited his vehicle and announced his office, and defendant "immediately jumped up and ran inside the residence." One of the other men also ran inside. McClendon again announced his office and followed defendant and the other man inside the residence. Other

officers who had arrived near the same time as McClendon followed defendant into the residence.

¶ 6　Defendant ran toward the back of the residence, and McClendon observed him place a two-tone handgun on top of a garbage bag near the rear door of the residence. McClendon ended his pursuit so he could recover the handgun. The other officers continued to pursue defendant. He observed defendant leave the residence through the rear door and head to the north, jumping fences.

¶ 7　McClendon picked up the handgun and removed the magazine and one live round from the chamber. He put the weapon in a box and handed the box to Officer Peter Amelio.

¶ 8　Officer Markus Williams testified that on July 19, 2016, he and his partner received an assignment to assist in an investigation, which involved "check[ing] out [a] tip that [the police] had [received] that there were handguns" at the residence. When he arrived at the residence, Williams was not sure if the residence was occupied or not, and he observed three or four unknown men standing on the front porch. He identified defendant in open court as one of the unknown men he observed.

¶ 9　Williams testified he pulled up to the residence and two of the men on the porch ran inside. Williams detained the one or two men who remained on the porch. Williams was "alerted" to the back area of the residence and looked through the gangway. He observed two men, one of whom was defendant, "jumping over the fence northbound." Williams followed defendant, keeping an eye on him and "giving him the flash," and ultimately detained him approximately 40 feet north of the residence in a gangway.[1] Williams testified approximately

_____

[1] Nothing in the record explains the meaning of the phrase "giving him the flash."

one minute elapsed between the time he observed defendant and the other man run inside the residence and when he detained defendant. Williams placed defendant in handcuffs and walked him back to the residence and turned him over to the officers.

¶ 10    Amelio testified he arrived at the residence approximately five minutes after McClendon and saw defendant in handcuffs on the sidewalk. Amelio spoke with McClendon inside the residence, and McClendon directed him to the box containing the handgun which had been discarded by defendant. When Amelio returned to the station, he inventoried the handgun, and it was submitted to the forensics laboratory for analysis.

¶ 11    The owner of the residence, Carolyn Randle, testified that on July 19, 2016, the building was closed, boarded up, and secured because the previous tenants "had just been put out" and no one was supposed to be living there. When asked how she had secured the building, Randle testified "[t]here was a 2x4 with bolts across the back door and then we locked down the front screens and had a dead – had a key lock on the railings for the rental agent to come in and show the property."

¶ 12    Randle testified she did not know defendant and had not given him, nor anyone else, permission to be there. She spoke to the police on July 19, 2016, and, afterward, she went to the property and observed the lockbox which contained the key had been broken, the key was out, and the property was open and unsecure. The front door was not broken but rather had been entered with the key.

¶ 13    Officer Nwagwu testified he processed defendant for his arrest and obtained his date of birth and address.[2]

_____

[2] Officer Nwagwu's first name is not identified in the record.

¶ 14   Robert Radmacher testified he worked for the Illinois State Police firearm services bureau, which handles all incoming firearm owner's identification (FOID) card and concealed carry license (CCL) applications. Radmacher searched a database using defendant's name and date of birth, which revealed defendant did not have a FOID card or CCL on the date of the offense.

¶ 15   The State also presented certified copies of two of his prior convictions, a 2011 conviction for manufacture and delivery of a controlled substance (720 ILCS 570/401(c)(2) (West 2010)) in case No. 11 CR 2128, and a 2012 conviction for UUWF (720 ILCS 5/24-1.1(a) (West 2012)) in case No. 12 CR 2723.

¶ 16   Defendant moved for a directed finding. The trial court denied the motion.

¶ 17   Christopher Johnson testified that at approximately 1 p.m. on July 19, 2016, he was with defendant, Larry Williams, and another man whose name he did not know on the porch of the residence. Johnson testified neither he, defendant, nor Larry lived at the residence and they "had no business" being there.

¶ 18   According to Johnson, a police officer in an unmarked car pulled up to the residence at issue and arrested him and defendant. Johnson did not know the officer was a police officer "until he got close to the gate" and announced his office because the officer was in plain clothes and his star and gun were not visible. He and defendant remained on the porch as Larry Williams and the other man fled through the house. The police officer handcuffed Johnson and defendant to the railing, kicked the door down, and ran inside the residence. Johnson, defendant, and Larry Williams were all arrested, but the fourth man got away.

¶ 19    Defendant testified that at approximately 1 p.m. on July 19, 2016, he was on the porch of the residence at issue with Johnson, Larry Williams, and "Marlo." None of the men on the front porch lived at the residence, and they were not supposed to be there. Defendant had been there for 5 to 10 minutes before a blue Ford Explorer pulled up and a man, whom defendant thought may have been the owner of the house, got out of the car. When the man got to the gate in front of the residence, he said "I am the police, don't move." Larry Williams and Marlo opened the door and ran "through the house."

¶ 20    The police officer handcuffed defendant and Johnson, kicked the door in, and entered the residence as other officers began to arrive. Defendant did not see where the officer went inside the house but believed he was inside for approximately 15 minutes. Defendant never went inside the house and never possessed a gun.

¶ 21    The trial court found defendant guilty of all five charged offenses. Defendant filed a posttrial motion. The court denied the motion and the matter proceeded to sentencing.

¶ 22    The presentence investigation report (PSI) set forth defendant's criminal history. In 2007, defendant was convicted of driving on a suspended or revoked license and spent four days in the Cook County jail. In 2009, he was convicted of selling a controlled substance and possessing marijuana in Minnesota and was sentenced to two years' probation. In 2011, he was convicted of manufacture and delivery of a controlled substance and sentenced to two years' probation, which was subsequently revoked.[3] In 2012, he was convicted of UUWF and aggravated assault based on his use of a firearm and sentenced to three years' imprisonment. In 2014, he was convicted of driving on a suspended or revoked license and spent two days in the Cook County jail. In 2015,

_____

[3] The PSI indicates defendant's probation was revoked the day after his 2012 convictions for UUWF and aggravated assault.

he was found guilty of street gang contact while on parole and spent two days in the Cook County jail. In 2016, he was found guilty by default of failing to register as a gun offender and fined $510 (see Chicago Municipal Code § 8-26-020 (amended March 13, 2013)).

¶ 23    The PSI further indicated defendant was 28 years old at the time of sentencing and was born to unwed parents who separated when he was four years old. Defendant was raised by his mother on the south side of Chicago and reported a normal childhood during which all of his basic needs were met. He reported the neighborhood in which he was raised and where he currently lived was "drug and gang infested." Defendant denied any abuse or neglect during his childhood and was never involved with the Department of Children and Family Services. He described a normal and respectful relationship with his mother.

¶ 24    Defendant attended Harper High School in Chicago but was expelled during his sophomore year due to fighting and absenteeism. He later enrolled at Banner South High School and earned his diploma in 2007. He reported that, during this time period, from the age 16 to 19, he abused marijuana, smoking "up to three 'blunts' " on a daily basis. Defendant received average grades and got along with his teachers and other students. After high school, he attended Dawson Technical Institute for six months in 2008 before he quit.

¶ 25    Defendant reported that from 2010 to 2011, he was employed on a part-time basis as a laborer rehabbing houses and earned $200 in cash per week. This was defendant's only employment experience. During his periods of unemployment, defendant was either incarcerated or supported by his family. Defendant did not have any future plans for employment. Prior to his incarceration, he was supported by his mother and received $195 per month in food stamp benefits.

¶ 26   Defendant was never married but was in a three-year relationship with Kiarra Jones, with whom he had a one-year-old child. Defendant reported he had two children, one of whom was five years old and the other two years old, from a previous relationship. Defendant saw his children on a weekly basis prior to his incarceration but did not provide financial support to them.

¶ 27   Defendant reported he was previously a member of the "Small World" street gang. He joined the gang when he was 15 years old but ended his affiliation when he was 21. However, a search of a police database indicated defendant was "involved in [g]ang [c]rime [a]ctivity" and was a member of the Gangster Disciples street gang.

¶ 28   In aggravation, the State argued defendant, in addition to the two felony convictions presented at trial, had convictions in 2014 for driving on a suspended or revoked license, in 2009 for possession of marijuana and sale of a controlled substance, and in 2007 for driving on a suspended or revoked license.[4] The State noted defendant was an affiliated gang member who was found with a loaded gun, which clearly made him a threat to others. Additionally, the State noted the PSI showed defendant had an antisocial personality and that his previous behavior reflected a lack of social conformity. The State recommended a sentence of "at least" 15 years.

¶ 29   In mitigation, defense counsel argued defendant's conduct did not cause any injury, and he never pointed the gun or brandished it but rather abandoned it. Counsel noted defendant had reported he was no longer a gang member and had not been since he was 21 years old. Defense counsel argued incarceration would not benefit the state but rather would cost taxpayers $20,000

---

[4] The State also noted defendant's 2016 conviction for failing to register as a gun offender and 2015 conviction for street gang contact, but the trial court stated it did not "put much credence" on those convictions.

per year. Further, incarceration would hinder defendant's ability to obtain employment. Defense counsel argued the convictions which formed the basis for the armed habitual criminal conviction were necessitated by the neighborhood in which defendant lived, stating it was "the only way people have to survive." Defense counsel suggested the minimum sentence was appropriate.

¶ 30    In allocution, defendant stated he had "a hard life growing up." Defendant stated he was raised by his mother and his father was not present. He stated he accepted his actions and asked for a second chance. The trial court asked defendant to clarify what he meant by his statement that he accepted his actions, and defendant replied that he accepted he was in the wrong place at the wrong time. He stated he and his lawyer tried to prove his innocence, and asked the court for less prison time so he could "get back out there to [his] kids and [his] mother."

¶ 31    In pronouncing defendant's sentence, the trial court stated as follows:

"For purposes of sentencing the court has considered the evidence at trial, the gravity of the offense, the [PSI], the financial impact of incarceration, all evidence[,] information[,] and testimony in [a]ggravation and [m]itigation, any substance abuse issues and treatment, the potential for rehabilitation, the possibility of sentencing alternatives, the statement of the defendant, and all hearsay presented and deemed relevant and admissible.

It then merged the counts and sentenced defendant to nine years' imprisonment on the armed habitual criminal count, which was to be served at 85 percent under the truth-in-sentencing law (730 ILCS 5/3-6-3(a)(2)(ii) (West 2016)).

¶ 32    Defendant filed a motion to reconsider sentence, in which he argued, in pertinent part, the trial court failed to consider the mitigating factors presented, considered improper aggravating factors, and imposed an excessive sentence. When asked for argument, defense counsel stated nine years was "way too much time" for defendant and noted defendant did not shoot or aim the gun at anyone. The court denied the motion, stating the sentencing ranges for those offenses, *i.e.*, shooting or aiming a gun at someone, were far greater than the applicable range in this case. This appeal followed.

¶ 33    Defendant first contends he was deprived of his constitutional right to effective assistance of counsel where defense counsel failed to file a motion to quash arrest and suppress evidence. When evaluating a claim of ineffective assistance of counsel, we apply a two-prong test under which the defendant must prove his counsel's performance fell below an objectively reasonable standard and the deficient performance prejudiced him. *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *People v. Caballero*, 126 Ill. 2d 248, 259-60 (1989). "To establish deficient performance, the defendant must overcome the strong presumption that counsel's action or inaction was the result of sound trial strategy." *People v. Perry*, 224 Ill. 2d 312, 341-42 (2007). Acts or omissions by counsel will not be considered matters of strategy, however, where there is no sound tactical reason that could conceivably support the act or omission. *People v. Nunez*, 263 Ill. App. 3d 740, 748 (1994).

¶ 34    Ordinarily, the decision to file a pretrial motion is a matter of trial strategy which cannot form the basis of a claim of ineffective assistance of counsel. *People v. Johnson*, 372 Ill. App. 3d 772, 777-78 (2007). Thus, "[w]here a defendant alleges that counsel was ineffective for failing to file a motion to suppress evidence, the defendant must overcome the 'strong presumption' that

counsel's decision was the result of sound trial strategy." *People v. Joiner*, 2018 IL App (1st) 150343, ¶ 38 (quoting *People v. Little*, 322 Ill. App. 3d 607, 611 (2001)). In this context, the defendant establishes prejudice by demonstrating "the unargued suppression motion is meritorious, and that a reasonable probability exists that the trial outcome would have been different had the evidence been suppressed." *People v. Henderson*, 2013 IL 114040, ¶ 15. We cannot find counsel's performance deficient where the motion would have been futile. *People v. Patterson*, 217 Ill. 2d 407, 438 (2005).

¶ 35     Instead, defendant argues the officers did not have probable cause to arrest him and, therefore, a motion to quash arrest and suppress evidence would have been meritorious. An arrest made without probable cause violates the United States and Illinois constitutions' prohibitions against unreasonable searches and seizures. *People v. Lee*, 214 Ill. 2d 476, 484 (2005). According to defendant, the only evidence relating to probable cause for his arrest was the officers' testimony they responded to a tip that there were guns at the residence and defendant's flight when McClendon identified himself and then arrested him after he was seen discarding a gun inside the residence. Asserting that the mere possession of a firearm inside one's home is not a crime (see *e.g.*, *People v. Aguilar*, 2013 IL 112116), defendant argues the record demonstrates the officers lacked probable cause to arrest him because they were not aware of any facts at the time of defendant's arrest that made his mere possession of the firearm illegal, *i.e.*, his criminal history and lack of a valid FOID card or CCL.

¶ 36     The State responds the record is not sufficient to resolve defendant's claim of ineffective assistance, suggesting this case is analogous to *People v. Burnett*, 2019 IL App (1st) 163018. In the alternative, the State argues the record contained sufficient evidence from which we can

determine the police officers had probable cause to arrest defendant at the time of his arrest. We agree with the State's alternative argument.

¶ 37    The police's determination of probable cause focuses on the facts known to the police at the time the arrest was made. *Lee*, 214 Ill. 2d at 484. "A warrantless arrest cannot be justified by what is found during a subsequent search incident to arrest." *Lee*, 214 Ill. 2d at 484. A court does not concern itself with a police officer's subjective belief as to the existence of probable cause; rather, we apply an objective analysis. *Id.* Police need only reasonable grounds to believe the defendant committed a crime to justify his or her arrest. *People v. Buss*, 187 Ill. 2d 144, 206 (1999). "The standard for determining whether probable cause is present is probability of criminal activity, rather than proof beyond a reasonable doubt." *Lee*, 214 Ill. 2d at 485. We must examine the totality of the circumstances to determine whether there is probable cause to believe defendant committed a crime and, therefore, is subject to arrest. *Id.* When police officers work in concert to effectuate an arrest, probable cause can be established from all the information collectively received by the officers even if that information is not specifically known to the officer who makes the arrest provided there is some sort of communication between the officers. *People v. Bramlett*, 341 Ill. App. 3d 638, 649-50 (2003).

¶ 38    In this case, defendant was seized for purposes of the Fourth Amendment when he was placed in handcuffs in the gangway north of the residence.[5] See *People v. Abram*, 2016 IL App (1st) 132785, ¶ 53 (seizure occurs when a person submits to a show of authority). Until that point, defendant had not submitted to the officers show of authority. Thus, we will examine the

---

[5] Although defendant testified at trial he was handcuffed on the porch, his argument on appeal defers to the State's version of events, *i.e.*, that he was handcuffed in the gangway north of the residence.

facts up to that point to determine whether the facts known to the officers were sufficient to establish probable cause. See *id.*

¶ 39    Our decision in *People v. Thomas*, 2019 IL App (1st) 170474, is instructive. In *Thomas*, the defendant was arrested and charged with AUUW after police observed him hand off a gun to his friend, Turner, in the common area of a multiunit apartment building and then flee into an upstairs apartment unit. *Id.* ¶ 2. The defendant filed a motion to quash his arrest and suppress evidence in which he asserted he was illegally stopped without reasonable suspicion and arrested without probable cause. *Id.* ¶ 4. At the hearing on the motion to suppress, the arresting officer testified he and his partner were patrolling due to the illegal activities of two rival gangs. *Id.* As the officers drove slowly down the street, they observed four or five men loitering in front of the multiunit apartment building. *Id.* The defendant and Turner fled into the building. *Id.* The arresting officer did not observe defendant holding a gun. *Id.* The arresting officer curbed the vehicle, jumped out, and followed the defendant and Turner into the building. *Id.*

¶ 40    The arresting officer testified he did not announce his office until he left his vehicle. *Id.* ¶ 5. He lost sight of the defendant and Turner for several seconds as the door had closed behind them but, when he reopened the door and stepped into the common area, he observed the defendant and Turner standing in a hallway. *Id.* ¶¶ 5-6. Both men looked in his direction, and the defendant promptly handed Turner a handgun and then fled upstairs to the second floor into an apartment, closing the door behind him. *Id.* ¶ 6. Turner threw the handgun on the second-stair landing and was detained. *Id.* The arresting officer recovered the loaded firearm and then returned to the apartment unit to which the defendant had fled. *Id.* ¶ 7. A woman opened the door and the defendant was arrested and handcuffed just outside the unit. *Id.* The defendant was

transported to the police station and only after that did the officers learn the defendant did not have a FOID card or CCL. *Id.*

¶ 41    The trial court granted the defendant's motion, concluding, in pertinent part, that when the police observed the defendant with a handgun, they did not have probable cause to stop, seize, and arrest defendant given the laws permitting the public to possess guns outside the home via a FOID card or CCL. *Id.* ¶ 12. On appeal, we analyzed the entire encounter between the police officers and the defendant.

¶ 42    Relevant here, we analyzed whether the officers had probable cause to arrest the defendant. *Id.* ¶¶ 34-40. We first noted that in *Aguilar*, 2013 IL 112116, ¶¶ 20-22, the supreme court held unconstitutional the categorical ban on the use and possession of operable firearms for self-defense outside the home, but recognized the right to such use and possession was subject to meaningful regulation, such as the requirement of a FOID card or CCL to do so. *Id.* ¶ 36. In determining the officers had probable cause to arrest the defendant, we noted the defendant (1) fled into an apartment building after looking directly at the officers and closed the door behind him; (2) handed a gun to Turner in the common area of the apartment building, which was not his land or home, in plain sight of the officers; and (3) then fled upstairs into an apartment unit and locked the door behind him. *Id.* ¶ 38. We concluded these facts "gave police probable cause to believe at the very least that defendant illegally possessed the gun" where they indicated, in part, a probability that the defendant did not have the necessary licenses. *Id.* Further, we found that the arresting officer's experience and the fact he was patrolling the area due to the activities of rival gangs added to the totality of the circumstances justifying probable cause. *Id.*

¶ 43 In this case, the totality of the circumstances leading up to defendant's arrest demonstrates the officers had probable cause to arrest him. When McClendon arrived at the residence, he left his vehicle while wearing body armor, his star around his neck, and his duty belt, and announced his office. Defendant immediately jumped up and fled inside the residence. McClendon pursued defendant and, inside the residence, observed defendant discard a two-tone handgun onto a garbage bag near the back door. After defendant discarded the handgun, he continued to flee, running out of the back door, and headed northbound, jumping fences. Williams was alerted to defendant's flight, and gave chase until he handcuffed defendant in the gangway 40 feet to the north of the residence. Based on defendant's actions after the police arrived at the residence, the officers could reasonably believe that he possessed the handgun illegally. *Id.* ¶ 38.

¶ 44 Defendant argues *Thomas* actually supports his position where we stated "under the current legal landscape, police cannot simply assume a person who possesses a firearm outside the home is involved in criminal activity" and "caution[ed] against an 'arrest first, determine licensure later' method of police patrol." *Thomas*, 2019 IL App (1st) 170474, ¶ 40. However, as in *Thomas*, "mere gun possession was not the scenario that presented itself to the police in this case. The totality of the circumstances suggested criminal activity." *Id.* Accordingly, because a motion to suppress would have been futile, defendant cannot demonstrate his counsel's performance was objectively unreasonable and his ineffective-assistance claim must fail. *Patterson*, 217 Ill. 2d at 438.

¶ 45 Defendant also contends he was denied a fair sentencing hearing. Prior to imposing the nine-year sentence, the trial court stated it had considered the evidence at trial, the gravity of the

offense, the PSI, the financial impact of incarceration, the evidence in aggravation and mitigation, any substance abuse issues and treatment, the potential for rehabilitation, the possibility of sentencing alternatives, the statement of the defendant, and all hearsay presented and deemed relevant and admissible. Acknowledging well-settled precedent to the contrary, defendant nevertheless argues this court should grant him a new sentencing hearing where the court failed to set forth its reasons for imposing the sentence. We disagree.

¶ 46    Section 5-4.5-50(c) of the Unified Code of Corrections states the sentencing judge "shall" set forth his or her reasons for imposing a particular sentence. 730 ILCS 5/5-4.5-50(c) (West 2016). In *People v. Davis*, 93 Ill. 2d 155, 162 (1982), the supreme court held the legislature's use of the word "shall" in the predecessor to section 5-4.5-50(c) was directory, not mandatory. The supreme court therefore concluded the trial court had no independent duty to explain the reasons for the sentences imposed and, by failing to request a statement of those reasons, the defendants had forfeited their contentions otherwise. *Id.* at 162-63.

¶ 47    From *Davis* emerged the now well-settled principles that a sentencing court is neither required to specify on the record the reasons for the sentence imposed, nor recite and assign value to each factor presented at the sentencing hearing. See *e.g.*, *People v. Brown*, 2018 IL App (1st) 160924, ¶ 18; *People v. Barnes*, 2017 IL App (1st) 143902, ¶ 95; *People v. Martin*, 2012 IL App (1st) 093506, ¶ 48; *People v. Brazziel*, 406 Ill. App. 3d 412, 434 (2010). Defendant acknowledges this well-settled authority but nevertheless urges this court to vacate his sentence and remand for a "more thoroughly considered sentencing decision."

¶ 48    In support of his contention, defendant relies on specially concurring and dissenting opinions, which asserted that, in the interest of fairness and transparency, the trial court should

explain to the defendant the bases for its sentencing decision. See *Davis*, 93 Ill. 2d at 163-68 (Simon, J., dissenting); *People v. Jackson*, 375 Ill. App. 3d 796, 804-10 (2007) (McDade, J., specially concurring, and Wright, J., concurring in part and dissenting in part); *People v. Bryant*, 2016 IL App (1st) 140421, ¶¶ 25-35 (Hyman, J., specially concurring). We recently rejected this argument in *Brown*, 2018 IL App (1st) 160924, ¶ 18, holding that "[w]hile we consider[ed] and respect[ed] the views of our colleagues," the specially concurring and dissenting opinions relied upon were not binding authorities. *Id.* Thus, we adhered to the well-established principles which developed from *Davis* while encouraging sentencing judges to explain the reasons for the sentence imposed in each case. *Id.* We likewise decline to depart from well-settled precedent which holds the trial court is not required to explain the bases for its sentencing decision or recite and assign weight to each factor presented at the sentencing hearing, and reject defendant's contention he was deprived of a fair sentencing hearing.

¶ 49    Finally, defendant argues the trial court abused its discretion in sentencing him to nine years' imprisonment. Specifically, defendant argues "nothing about the facts of this case or the evidence in aggravation justified [the nine-year] sentence, which is three years above the minimum sentence." Further, defendant argues the nine-year sentence failed to account for the mitigation evidence presented in the PSI, such as defendant's "chaotic" childhood and his substantial rehabilitative potential. We disagree.

¶ 50    The Illinois Constitution states "[a]ll penalties shall be determined both according to the seriousness of the offense and with the objective of restoring the offender to useful citizenship." Ill. Const. 1970, art. I, § 11. To achieve the constitutionally mandated balance between the retributive and rehabilitative purposes of punishment, the trial court must carefully consider all

aggravating and mitigating factors, including: "the defendant's age, demeanor, habits, mentality, credibility, criminal history, general moral character, social environment, and education, as well as the nature and circumstances of the crime and of defendant's conduct in the commission of it." *People v. Quintana*, 332 Ill. App. 3d 96, 109 (2002).

¶ 51    The trial court, not the reviewing court, is in the best position to assess these factors because it has observed the defendant and the proceedings. *People v. Alexander*, 239 Ill. 2d 205, 213 (2010). Accordingly, "[t]he trial court has broad discretionary powers in imposing a sentence, and its sentencing decisions are entitled to great deference." *Id.* at 212. It is not our function to reweigh the evidence in aggravation and mitigation and substitute our judgment for that of the trial court because we would have weighed these factors differently. *People v. Stacey*, 193 Ill. 2d 203, 209 (2000). We will overturn a sentence only where the court has abused its discretion. *People v. Sauseda*, 2016 IL App (1st) 140134, ¶ 19. An abuse of discretion occurs when the court's sentence "is greatly at variance with the spirit and purpose of the law or manifestly disproportionate to the nature of the offense." *People v. Charleston*, 2018 IL App (1st) 161323, ¶ 16.

¶ 52    We conclude the trial court did not abuse its discretion when it sentenced defendant to nine years' imprisonment. Armed habitual criminal is a Class X felony punishable by 6 to 30 years' imprisonment. 720 ILCS 5/24-1.7(b) (West 2016); 730 ILCS 5/5-4.5-25(a) (West 2016). The court sentenced defendant to nine years' imprisonment, which is within the applicable sentencing range. Because the sentence is within the applicable range, we presume the sentence is proper. *Charleston*, 2018 IL App (1st) 161323, ¶ 17. This presumption will be rebutted only if defendant makes an affirmative showing the sentence greatly departs from the spirit and purpose

of the law or the constitutional guidelines. *People v. Boclair*, 225 Ill. App. 3d 331, 335 (1992). Defendant has failed to make such a showing.

¶ 53    Defendant contends the trial court overlooked factors and evidence in mitigation, including his education and employment history, his close relationship with his mother and children, and his "rough" childhood. According to defendant, the court did not consider this evidence, which demonstrated his rehabilitative potential. Further, defendant contends the seriousness of the offense and his criminal history did not warrant a nine-year sentence.

¶ 54    Defendant essentially invites this court to reweigh the evidence in aggravation and mitigation and substitute our judgment for that of the trial court. We decline to do so. *Stacey*, 193 Ill. 2d at 209. Moreover, trial courts are not required to impose the minimum sentence in the absence of any aggravating factors, even where mitigating factors are present. *Quintana*, 332 Ill. App. 3d at 109.

¶ 55    The record belies defendant's argument the trial court failed to consider the evidence in mitigation to which he points on appeal. There exists a presumption the court considered all mitigating factors supported by the record absent some affirmative indication, other than the sentence itself, to the contrary. *People v. Jones*, 2014 IL App (1st) 120927, ¶ 55. The record shows all of the mitigating evidence defendant raises here was before the court in the PSI and the evidence it heard at trial and was argued by defense counsel. When announcing the sentence, the trial court noted it had reviewed the PSI and considered all the factors in aggravation and mitigation in light of the evidence adduced at trial and sentencing, as well as defendant's potential for rehabilitation and his statement in allocution. Thus, the record reflects the court considered all the mitigating evidence presented by defendant.

¶ 56 Defendant contends his education and employment history demonstrated his rehabilitative potential and weighed toward a lesser sentence. Defendant notes he was a high school graduate who most recently worked as a part-time laborer from 2010 to 2011. However, the record also reveals his work as a part-time laborer was his only prior work experience, despite the fact he finished his education in 2008. When defendant was not incarcerated, he did not work other than this one period of part-time employment. Moreover, defendant's 2009 and 2011 convictions for selling controlled substances indicate he supported himself, at least in part at various times, by engaging in illegal conduct. Thus, while defendant commendably returned to finish high school after being expelled and pursued vocational training, his education and employment history also demonstrate he has, for large portions of his life, failed to use his education and training to obtain employment. The trial court is not required to weigh alleged mitigating evidence in favor of a lesser sentence, especially where that same evidence could be weighed against the defendant. See *People v. Brown*, 2017 IL App (1st) 142877, ¶ 63 (trial court determines weight to be given mitigating evidence).

¶ 57 Defendant argues the crime was not so serious as to justify his nine-year prison sentence. The seriousness of the crime committed is the most important factor in fashioning an appropriate sentence. *People v. Gutierrez*, 402 Ill. App. 3d 866, 902 (2010). Defendant argues other than his possession of the handgun, "he was not engaged in any criminal activity whatsoever," he never brandished the gun, he did not show any intent to use the gun, nor did he threaten to use the gun.

¶ 58 Initially, we note the record does not support defendant's assertion he was not engaged in any other criminal activity other than his possession of the gun. He was trespassing on Randle's property. In any event, while defendant may not have used the handgun during the offense, the

gun was loaded and readily capable of being used, and defendant was more than willing to abandon that weapon where anybody could have found it. We disagree defendant's possession of a loaded firearm was not sufficiently serious to warrant a sentence of nine years' imprisonment, particularly where the legislature has seen fit to ban the possession of any firearm, not just a loaded firearm, by individuals with defendant's criminal history, and determined the appropriate punishment for such possession is a prison term of 6 to 30 years. See 720 ILCS 5/24-1.7 (West 2016) (banning possession of "any firearm" by individuals with two prior qualifying convictions and classifying the possession as a Class X felony).

¶ 59    Defendant also argues his criminal history did not support the sentence imposed. According to defendant, his criminal history revealed only a 2012 felony conviction for UUWF, 2011 conviction for manufacture and delivery of a controlled substance, and two 2009 convictions in Minnesota, one of which was for possession of marijuana and the other for sale of a controlled substance. Additionally, defendant notes his only prior prison sentence was three years for the 2012 UUWF conviction.

¶ 60    We conclude defendant's criminal history did not weigh against the nine-year sentence imposed in this case. As an initial matter, we reject defendant's contention that the trial court could not rely on his 2011 conviction for manufacture and delivery of a controlled substance and 2012 conviction for UUWF (the predicate felonies) as those convictions were facts implicit in the offense and could not serve as aggravating factors. We squarely rejected this contention in *Brown*, 2018 IL App (1st) 160924, ¶ 21, wherein we held the trial court could properly consider the defendant's prior UUWF conviction as part of his criminal history at sentencing even though that offense served as a predicate offense for the armed habitual criminal conviction on which he

was sentenced. See also *People v. Thomas*, 171 Ill. 2d 207, 229 (1996) (concluding use of prior convictions to impose Class X sentence did not preclude the court from considering those same prior convictions in aggravation). We conclude as we did in *Brown* that the trial court did not improperly consider defendant's the predicate offenses when it considered defendant's criminal history at sentencing.

¶ 61    The PSI indicates defendant's criminal conduct has escalated since his first conviction in 2007 for driving on a suspended or revoked license. He was convicted in Minnesota in 2009 for two drug offenses and sentenced to two years' probation. Less than two years after his 2009 convictions, in 2011, defendant was convicted of manufacture and delivery of a controlled substance and again sentenced to probation, which was revoked less than 18 months later. In 2012, his possession of a firearm and use of it in an assault led to convictions for UUWF and aggravated assault, for which he was sentenced to three years imprisonment.[6] Less than 16 months later, in April 2014, defendant was again convicted of driving on a suspended or revoked license.

¶ 62    We fail to see how defendant's criminal history did not warrant a nine-year prison term. We also fail to see how the imposition of a sentence three times longer than defendant's only other prison sentence was an abuse of discretion. It is clear that less-restrictive means of punishment have not deterred defendant from continuing to engage in criminal conduct. See *People v. Wilson*, 2016 IL App (1st) 141063, ¶ 13 (noting the defendant was not deterred by previous, more lenient sentences).

---

[6] The timing of defendant's 2012 convictions and the revocation of his 2011 sentence of probation suggests the conduct which formed the basis for his 2012 conviction was the same conduct which led to the revocation of his probation.

¶ 63    In sum, we conclude the trial court did not abuse its discretion by sentencing defendant to nine years' imprisonment. The record shows the trial court considered the pertinent mitigating and aggravating factors and imposed a punishment toward the low end of the applicable sentencing range. Accordingly, we affirm defendant's sentence.

¶ 64    For the reasons stated, we affirm the trial court's judgment.

¶ 65    Affirmed.