2020 IL App (1st) 180825-U

FOURTH DIVISION
September 24, 2020

No. 1-18-0825

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE APPELLATE COURT
OF ILLINOIS
FIRST JUDICIAL DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Cook County |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 16 CR 17904 |
| RAYDELL JONES, | ) ) | |
| Defendant-Appellant. | ) ) ) ) ) | Honorable Mary Margaret Brosnahan, Judge Presiding. |

_____

JUSTICE REYES delivered the judgment of the court.
Presiding Justice Gordon and Justice Lampkin concurred in the judgment.

**ORDER**

¶ 1    *Held*:  Affirming the judgment of the circuit court of Cook County denying defendant's motion to quash arrest and suppress evidence where defendant was not seized when he was approached by the police officer and, even if such a seizure occurred, the totality of the circumstances demonstrated there was reasonable articulable suspicion to stop defendant.

¶ 2    Following a jury trial, defendant Raydell Jones was found guilty of unlawful use of a

weapon by a felon and sentenced to four-and-a-half-years' imprisonment in the Illinois

Department of Corrections. On appeal, defendant argues that the trial court erred in denying his motion to quash arrest and suppress evidence where he was seized without the officers having reasonable articulable suspicion. Alternatively, defendant asserts that even if the officers had reasonable articulable suspicion, they did not have probable cause to arrest him without first determining whether he legally owned the firearm they discovered. Defendant requests that this court suppress the firearm and his identity as a felon and reverse his conviction outright. For the reasons that follow, we affirm the judgment of the trial court.

¶ 3                                    BACKGROUND

¶ 4      On November 9, 2016, defendant was arrested for possessing a loaded firearm after having previously been convicted of a felony. Defendant was thereafter charged by indictment with one count of armed habitual criminal, two counts of unlawful possession of a weapon by a felon, two counts of unlawful possession of a weapon while on parole, and nine counts of aggravated unlawful use of a weapon. Ultimately, the State proceeded to trial on two counts of unlawful use of a weapon by a felon predicated on defendant's possession of a firearm and ammunition.

¶ 5                    Motion to Quash Arrest and Suppress Evidence

¶ 6      Defendant filed a pretrial motion to quash arrest and suppress evidence wherein he argued that he was seized by police officers at the 4400 block of West Monroe in Chicago as he was approached on the sidewalk and that the police officers did not have reasonable articulable suspicion to instigate a stop. He further argued that the police officers lacked probable cause to search his vehicle. Thus, based on these arguments, defendant maintained that his arrest should be quashed and the fruits of that arrest, namely the firearm discovered in his vehicle, must be suppressed.

¶ 7      At the suppression hearing, Officer Edmund Daly of the Chicago Police Department testified that on November 9, 2016, he was conducting surveillance on the 4400 block of West Monroe in Chicago.  He arrived at 1:20 p.m. in an unmarked police vehicle and was wearing plain clothes.  Officer Daly curbed his vehicle on the north side of the one-way street facing west.  A few minutes later, Officer Daly observed three unknown males exit a gangway and congregate on the sidewalk on the south side of the street approximately 250 feet in front of him.  As vehicles drove by, Officer Daly heard the three men yell "got them blows" (meaning heroin) at vehicles as they passed.  He also observed them making hand gestures and directing vehicles where to park.

¶ 8      Ten minutes later, Officer Daly observed a silver Chevy Malibu travel down the block and park on the south side of the street near the three men.  Defendant, as identified by Officer Daly in court, exited the vehicle and approached the three men.  No other individuals were observed inside the defendant's vehicle.  They engaged in a brief conversation and defendant walked back to the rear driver's side door of the Malibu.  Officer Daly watched as defendant glanced "multiple times in quick fashion to the north and south as he opened the door." Defendant's hands were at his front waistband as he bent over into the vehicle.  Officer Daly could not view defendant's hands once defendant was inside the vehicle.  According to Officer Daly, defendant remained in this position for a second or two, exited the vehicle again, closed the door, and walked back over to the three men.  At no time did Officer Daly observe any bulges in defendant's clothing nor did any of the three men exchange anything with defendant.

¶ 9      Officer Daly radioed his other undercover colleagues regarding his observations.  One unmarked police vehicle responded to the call, followed by another unmarked police vehicle shortly thereafter.  Officer Daly further testified that he observed two police officers speak with

defendant and the three men on the sidewalk. Shortly thereafter, Officer Daly observed Officer William Hronopoulos walk toward defendant's vehicle. He then viewed defendant being placed in handcuffs after Officer Hronopoulos returned to where defendant was standing.

¶ 10    On cross-examination, Officer Daly testified that he was conducting surveillance on the block because numerous citizens had complained about gang activity.

¶ 11    The defense rested and the State presented the testimony of Sergeant Terrence Forbes of the Chicago Police Department. According to Sergeant Forbes, on November 9, 2016, at 1 p.m. he was working with a surveillance team on the 4400 block of West Monroe. He and his partner, Officer Hronopoulos, were in an unmarked police vehicle and were in plain clothes. Officer Daly had eyes on the block and was reporting his observations over the radio in real time. He further testified that at this time he received a police radio dispatch that a silver four-door vehicle had been involved in a shooting "a couple blocks" east of their location. Based on this police radio dispatch and Officer Daly's observations, Sergeant Forbes and Officer Hronopoulos drove to defendant's location. They approached the one-way street from the wrong direction and parked their police vehicle one car length behind and to the north of defendant's vehicle. According to Sergeant Forbes, defendant's vehicle was not blocked in.

¶ 12    The officers exited their vehicle and approached defendant and the three other men who were standing on the sidewalk. As Sergeant Forbes approached, defendant looked towards him and then took a step towards his vehicle, away from the other three individuals. Sergeant Forbes asked defendant his name and what he was doing there. He then asked defendant if he had a form of identification. Defendant replied that his driver's license was in the vehicle and stepped toward the vehicle pressing the key fob. As defendant made these movements, Sergeant Forbes stepped between defendant and the vehicle, directing him away from the vehicle. Sergeant

Forbes testified he reacted this way because, based on Officer Daly's observations, he believed a weapon was in the vehicle. Sergeant Forbes then walked defendant over towards his police vehicle where Officer Hronopoulos was speaking with other subjects and "had them [(the subjects)] stand by our police vehicle."

¶ 13    Sergeant Forbes asked defendant if there were any weapons in the vehicle and defendant replied, "to the effect that he didn't know." Sergeant Forbes informed defendant that he would get the driver's license from the vehicle and asked if he could look inside. Defendant replied, "sure." Officer Hronopoulos went over to the rear driver's side door of defendant's vehicle and looked inside. From the window, Officer Hronopoulos viewed a handgun on the floor behind the driver's seat. Officer Hronopoulos recovered the weapon and defendant was arrested.

¶ 14    On cross-examination, Sergeant Forbes testified that the information from Officer Daly was not the sole basis for the stop; it was also based on the information from the police radio that a silver sedan had been involved in a possible shooting just east of their location and was traveling westbound. According to Sergeant Forbes, this shooting had occurred within 15 minutes of when defendant was arrested. Sergeant Forbes further testified that defendant did not flee when he approached and that a minute after he arrived another unmarked police vehicle with two officers arrived at the scene. Thus, there were four subjects and three officers standing near Sergeant Forbes' police vehicle while Officer Hronopoulos looked into defendant's vehicle. In addition, Sergeant Forbes testified he did not tell defendant he was free to leave and did not say defendant could refuse to answer questions. He also testified that he never viewed defendant with a firearm.

¶ 15    On redirect, Sergeant Forbes testified that while all the officers were carrying firearms, no officer drew his weapon during the encounter with defendant.

¶ 16     After hearing argument from defense counsel, the trial court denied defendant's motion to quash arrest and suppress evidence finding that defendant was not seized when Sergeant Forbes approached and that the officers had reasonable articulable suspicion to stop defendant. Specifically, in regard to whether defendant was seized, the trial court found that defendant was outside on the sidewalk at the time, he was not transported to another location, the officers did not draw their weapons, and that defendant's vehicle was not blocked-in by the officers. In regard to the reasonable articulable suspicion, the trial court found that the location where defendant was stopped was a hotbed of gang activity and violence. Officer Daly had also observed drug activity in the area that day. In addition, the call over the police radio indicated a silver sedan was traveling in the same direction as defendant's sedan thus, based on the totality of the evidence, the stop was valid.

¶ 17                                    Trial

¶ 18     The matter proceeded to a jury trial on counts two and three of the indictment for unlawful use of a weapon by a felon in that defendant unlawfully possessed a firearm and ammunition. The State nol-prossed the remaining charges.

¶ 19     Officer Daly's trial testimony was substantially similar to that of his testimony during the motion to quash arrest and suppress evidence. Sergeant Forbes also testified similarly to his prior testimony, but in addition stated that when he first spoke with defendant they were six feet apart and that defendant was cooperative.

¶ 20     Officer Hronopoulos testified that on November 9, 2016, he was part of a team conducting surveillance on the 4400 block of West Monroe in Chicago. At 1 p.m. Officer Hronopoulos was acting as an enforcement officer and, after receiving information from Officer Daly and the police radio, drove the wrong way up West Monroe and parked on the north side of

the street east of the silver sedan. According to Officer Hronopoulos, as soon as he exited his unmarked police vehicle the four men, including defendant, began to disperse but they did not flee. He approached the three unidentified men while Sergeant Forbes spoke with defendant. After bringing the three men over to stand near his squad car, Officer Hronopoulos walked over to the silver sedan and observed a firearm on the passenger floorboard behind the driver's seat. He recovered the firearm, made the firearm safe by removing a bullet from the chamber, and inventoried it.

¶ 21    On cross-examination, Officer Hronopoulos testified that when he arrived at the scene, he did not observe any of the four individuals engaging in any illegal activity.

¶ 22    No testimony was provided by any of the officers regarding whether defendant had a Firearm Owner's Identification Card or whether they inquired as to whether the handgun belonged to him.

¶ 23    Matthew Savage, an evidence technician with the Chicago Police Department, testified as an expert in latent fingerprint recovery. Savage testified that he examined the firearm, ammunition, and magazine recovered and did not discover any fingerprints on those items.

¶ 24    Prior to resting, the State entered a stipulation that defendant had been convicted of a prior felony. The State then rested and defendant presented no evidence.

¶ 25    After hearing closing arguments and jury instructions, the jury deliberated and ultimately found defendant guilty of unlawful possession of a weapon by a felon and not guilty of possession of ammunition. Thereafter, defendant filed a motion for a new trial in which he argued, in pertinent part, that the motion to quash arrest and suppress evidence should have been granted. The trial court denied the motion for a new trial reiterating the basis it originally set forth. The matter proceeded to a sentencing hearing and the trial court, after considering

evidence in aggravation and mitigation, sentenced defendant to four-and-a-half years in the Illinois Department of Corrections. This appeal followed.

¶ 26                                    ANALYSIS

¶ 27    On appeal, defendant argues that the trial court erred in denying his motion to quash arrest and suppress evidence where he was seized without the officers having reasonable articulable suspicion. Alternatively, defendant asserts that even if the officers had reasonable articulable suspicion, they did not have probable cause to arrest him without first determining whether he legally owned the firearm they discovered. Defendant argues that this court should suppress the firearm and his identity as a felon and reverse his conviction outright.

¶ 28                              Standard of Review

¶ 29    Before addressing the merits, we first consider our standard of review. When reviewing a trial court's ruling on a motion to quash an arrest and suppress the evidence seized, we accord great deference to the trial court's factual findings unless they are against the manifest weight of the evidence, but we review *de novo* the legal question of whether suppression is warranted under those facts. *People v. Hopkins*, 235 Ill. 2d 453, 471 (2009). In this case, defendant does not contest the credibility of the witnesses but challenges the trial court's ultimate legal conclusions based on undisputed facts; accordingly, our review is *de novo. People v. Timmsen*, 2016 IL 118181, ¶ 11.

¶ 30                                   Seizure

¶ 31    The fourth amendment to the United States Constitution guarantees the right of the people to be secure against unreasonable searches and seizures. U.S. Const., amend. IV. Because the fourth amendment is not implicated until a seizure occurs, our first inquiry is to determine when defendant was seized. *People v. Nitz*, 371 Ill. App. 3d 747, 750 (2007). Under

the fourth amendment, "an individual is seized when an officer by means of physical force or show of authority, has in some way restrained the liberty of a citizen." (Internal quotation marks omitted.) *People v. Harris*, 228 Ill. 2d 222, 246 (2008). Formulated another way, "a person has been seized when, considering the totality of the circumstances, a reasonable person would believe he was not free to leave." *People v. Oliver*, 236 Ill. 2d 448, 456 (2010) (citing *United States v. Mendenhall*, 446 U.S. 544, 554 (1980)).

¶ 32 Not every encounter between the police and a private citizen results in a seizure. *People v. Luedemann*, 222 Ill. 2d 530, 544 (2006). "Courts have divided police-citizen encounters into three tiers: (1) arrests, which must be supported by probable cause; (2) brief investigative detentions, or '*Terry* stops,' which must be supported by a reasonable, articulable suspicion of criminal activity; and (3) [consensual] encounters that involve no coercion or detention and thus do not implicate fourth amendment interests." *Id.*

¶ 33 The police have the right to approach citizens and ask potentially incriminating questions, and an officer does not violate the fourth amendment merely by approaching a person in public to ask questions if the person is willing to listen. *Id.* at 549. For example, the police may approach a person standing or seated in a public place or seated in a parked vehicle and ask questions of that person without that encounter constituting a seizure. *Id.* at 552.

¶ 34 In a consensual encounter, the issue is not whether the person feels free to leave but, rather, whether a reasonable person would feel free to decline the officer's requests or otherwise terminate the encounter. *Id.* at 550. Factors that may be indicative of a seizure include "(1) the threatening presence of several officers; (2) the display of a weapon by an officer; (3) some physical touching of the person of the citizen; and (4) the use of language or tone of voice indicating that compliance with the officer's request might be compelled." *Id.* at 553. In the

absence of some such evidence, otherwise inoffensive contact between a member of the public and the police cannot, as a matter of law, amount to a seizure of that person. *Id.*

¶ 35     We further observe that on a motion to suppress, the burden of proving that a search or seizure was unlawful is on the defendant. 725 ILCS 5/114-12(b) (West 2016); *People v. Cregan*, 2014 IL 113600, ¶ 23. If a defendant makes a *prima facie* showing that the seizure was unreasonable, the burden then shifts to the State to provide evidence countering defendant's *prima facie* showing. *Id.* The ultimate burden, however, remains with the defendant. *Id.*

¶ 36     Defendant argues that he was seized when Sergeant Forbes stepped in front of him and physically prevented him from walking to the Malibu. According to defendant, Sergeant Forbes restrained defendant's movement by a show of authority and an implication of physical force. Defendant contends this show of authority was apparent in the fact that one police vehicle traveled the wrong way up the one-way street, double parked, and that the officers were wearing vests that said "Police" across the back with their weapons visible. Defendant also notes that immediately upon arriving at the scene Sergeant Forbes asked defendant what he was doing there. Thus, based on these circumstances, defendant argues no reasonable person would have felt free to terminate the encounter.

¶ 37     The State disagrees and argues that defendant was not seized when Sergeant Forbes directed him away from the vehicle. The State observes that defendant was only approached by one officer and no weapons were displayed. In addition, there was no evidence that defendant was physically touched by any of the officers or that the officers ever spoke in a tone indicating that defendant must comply with their requests.

¶ 38     Based on our review of the record, we conclude that defendant was not seized when he was approached by Sergeant Forbes or when he was directed to stand near the police vehicle. As

noted by the State, defendant was initially only approached by one officer, Sergeant Forbes. As Sergeant Forbes approached defendant, he was not wearing a uniform and did not have his weapon drawn. According to Sergeant Forbes' testimony, as he approached defendant took a step away from the group and toward his vehicle. Defendant's movement at that time is indicative that he did feel free to leave. See *People v. Tilden*, 70 Ill. App. 3d 859, 862 (1979) ("In order to constitute the restraint on the freedom to walk away, which is the essence of a seizure, there must be some element of force or of threatened force."). Sergeant Forbes then spoke with defendant and asked him some basic questions. See *Luedemann*, 222 Ill. 2d at 549; 725 ILCS 5/107-14 (West 2016). There was no testimony elicited regarding the tone or volume of Sergeant Forbes' voice at this time. Furthermore, there was nothing in the language utilized by Sergeant Forbes which would lead a reasonable person to believe they were seized. There is also no evidence that Sergeant Forbes physically touched defendant. As defendant went to approach his vehicle, Sergeant Forbes stepped between defendant and the vehicle and directed him towards their police vehicle. While Sergeant Forbes did encourage defendant to move toward the police vehicle, nothing prevented defendant from disregarding this suggestion and proceeding on his way. See *Florida v. Royer*, 460 U.S. 491, 497-98 (1983) ("The person approached, however, need not answer any question put to him; indeed, he may decline to listen to the questions at all and may go on his way.").

¶ 39     In reaching this conclusion, we have considered *People v. Smith*, 331 Ill. App. 3d 1049, (2002), which defendant relies on to support his position that he was seized when Sergeant Forbes spoke to him and directed his movement. We find the officers' actions in *Smith* to be distinguishable from Sergeant Forbes' actions in this case. In *Smith*, the reviewing court found that when the officers initially approached the defendant and asked him questions there was no

seizure because the defendant was already stopped, standing in front of a " 'known drug house.' " *Id.* at 1052-53. The *Smith* court observed that, "'There is nothing in the Constitution which prevents a policeman from addressing questions to anyone on the streets.'" *Id.* at 1053 (quoting *Terry v. Ohio*, 392 U.S. 1, 34 (1968) (White, J., concurring)). The *Smith* court also noted that the defendant was "free at that point to answer the officers' questions or ignore them; he could also remain where he was or simply walk away." *Id.* (citing *Royer*, 460 U.S. at 497-98). The *Smith* defendant, however, chose to respond to the question about what he was doing but to ignore the question concerning the contents of his pockets. Thereafter, the officers told the defendant to take his hands out of his pockets. The defendant became nervous, looked around and began to back away from the officers. The officers then instructed the defendant to stop and to take his hands out of his pockets, but defendant continued to back up and kept his hands in his pockets. The officers repeated this request additional times. When the request was not complied with the officers grabbed the defendant's arms. *Id.* The *Smith* court determined that defendant was not seized when the officers instructed him to stop, but rather when he was physically restrained by them. *Id.* at 1053-54. In contrast, defendant here was never physically restrained by the officers and, therefore, *Smith* is inapposite.

¶ 40    Defendant also relies on *People v. Gherna*, 203 Ill. 2d 165, 180 (2003), *People v. Chestnut*, 398 Ill. App. 3d 1043, 1054 (2010), and *People v. Beverly*, 364 Ill. App. 3d 361, 370 (2006), to demonstrate that the officers did not have to touch defendant in order for him to be seized. Those cases are also distinguishable from the case at bar. In *Gherna*, the court found the defendant was seized when two police officers positioned their bicycles in a way that prevented the defendant from exiting the vehicle or driving away from the scene. *Gherna*, 203 Ill. 2d at 180. Here, however, there was no evidence that the officers or their vehicles were placed in a

manner that prevented defendant from walking away. In *Chestnut*, the reviewing court found the defendant was seized after he had been restrained to a porch by officers who were standing at each of the exits. *Chestnut*, 398 Ill. App. 3d at 1054. Again, there was no evidence here that defendant's movement was restrained in any manner. Similarly, in *Beverly*, the reviewing court concluded that the defendant was seized where the police utilized their squad car to block the defendant's vehicle into the parking space. *Beverly*, 364 Ill. App. 3d at 370. Furthermore, there was explicit testimony in this case that the police officers' vehicle was parked in such a manner that did not block defendant's vehicle into a parking space.

¶ 41    Indeed, the facts here are inapposite. Defendant was not blocked by bicycles, the officers did not restrain him to a porch, nor did they block his vehicle with their squad vehicles. In fact, the record demonstrates that defendant was approached on an open sidewalk and that his initial reaction upon seeing the officers approach was to step away. Notably, defendant provides no case law in support of a seizure on facts similar to those in this case. Thus, on this record, defendant's actions, and the circumstances at the time the officers approached, demonstrate that defendant was not seized.

¶ 42                                  *Terry* Stop

¶ 43    Even if Sergant Forbes' actions amounted to a seizure, we find such a seizure was based on reasonable articulable suspicion and therefore the officers were justified in conducting a *Terry* stop.

¶ 44    "Reasonableness under the fourth amendment generally requires a warrant supported by probable cause" (*People v. Johnson*, 237 Ill. 2d 81, 89 (2010)), but the Supreme Court in *Terry* recognized an exception to the warrant requirement. "Under *Terry,* a police officer may briefly stop a person for temporary questioning if the officer has knowledge of sufficient articulable

facts at the time of the encounter to create a reasonable suspicion that the person in question has committed or is about to commit a crime." *People v. Lee*, 214 Ill. 2d 476, 487 (2005). This suspicion must amount to more than a mere hunch. *Gherna*, 203 Ill. 2d at 177. Illinois has codified the law of *Terry* in section 107-14 of the Code of Criminal Procedure of 1963: "[A] peace officer *** may stop any person in a public place for a reasonable period of time when the officer reasonably infers from the circumstances that the person is committing, is about to commit or has committed an offense *** and may demand the name and address of the person and an explanation of his actions." 725 ILCS 5/107-14 (West 2014).

¶ 45     When reviewing the officer's actions, a court applies an objective standard to decide whether the facts available to the officer at the time would lead an individual of reasonable caution to believe that the actions taken were appropriate. *People v. Close*, 238 Ill. 2d 497, 505 (2010). The validity of such a stop rests upon the totality of the facts and circumstances known to the officer at the time of the stop. *People v. Adams*, 225 Ill. App. 3d 815, 818 (1992).

¶ 46     Defendant maintains that the stop was not justified where there was no evidence presented regarding the quality of the information known to the officers. Specifically, defendant asserts that there was no evidence regarding who made the call and therefore no way to assess the reliability of the radio dispatch. Defendant also asserts that his behavior (not speeding, parking his vehicle, and then approaching the three men) was not indicative of someone fleeing a shooting and therefore did not provide any reasonable articulable suspicion.

¶ 47     The State argues that the officers had reasonable suspicion based on defendant's behavior as observed by Officer Daly and the radio call that a vehicle similar to that driven by defendant had been involved in a possible shooting nearby. Specifically, the State notes that defendant was making furtive movements with his hands near his front waistband while glancing up and down

the block multiple times in a quick fashion. Defendant then quickly entered and exited the vehicle. The State urges that these actions taken together suggest potential criminal activity, that of concealing a firearm. The State further observes that the location where Officer Daly was conducting surveillance was a high crime area and when defendant was asked by Sergeant Forbes whether there was a firearm in the vehicle, defendant equivocated stating "I don't know." In addition to defendant's behavior, the State argues that the description of the vehicle involved in a possible shooting was similar to defendant's vehicle in color and type, had been traveling in the same direction as defendant, and the shooting incident had occurred a few blocks east and close in time to when defendant was observed driving the vehicle.

¶ 48 Using an objective standard, the facts and circumstances known to Sergeant Forbes here warranted a person of reasonable caution to believe a stop was necessary to investigate the possibility of criminal activity. See *People v. Fields*, 2014 IL App (1st) 130209, ¶¶ 21, 24 (officers conducted a proper *Terry* stop that allowed the officers to investigate "the circumstances that provoked suspicions"). We first observe that Sergeant Forbes was aware of the police radio dispatch which indicated that a possible shooting had occurred "a couple of blocks" away from the 4400 block of West Monroe. Furthermore, the reported incident occurred within 15 minutes of when defendant was arrested and involved a vehicle matching the description of defendant's vehicle. While there was no testimony regarding the reliability of the source of the information in the police dispatch because it came over the police radio, we cannot say that it was absolutely unreliable as defendant suggests. See *People v. Redding*, 2020 IL App (4th) 190252, ¶ 25 ("[T]he legality of the stop is not necessarily based on the original source of the information but instead on the objective reasonableness of the officer's actions based on the facts available to him at the time of the stop.").

¶ 49　In addition, the dispatch was not the sole reason for the stop. See *People v. McMichaels*, 2019 IL App (1st) 163053, ¶ 24 ("the tip was just one of several factors that, viewed from the perspective of a reasonable officer, made the *Terry* stop valid."). Sergeant Forbes was also aware of Officer Daly's observations of defendant. Specifically, Officer Daly relayed to the surveillance team that defendant traveled westbound on West Monroe, parked his vehicle, and then approached the three men who were standing on the sidewalk. After speaking with them briefly, Officer Daly observed defendant walk back to the rear driver's side door of the Malibu. According to Officer Daly, before defendant entered the back seat of the vehicle his hands were near his waistband and he glanced up and down the block quickly. See *Illinois v. Wardlow*, 528 U.S. 119, 124 (2000) (nervous, evasive behavior is a pertinent factor in determining reasonable suspicion). Defendant then reached into the vehicle. At that point defendant's hands could not be observed. Indeed, Officer Daly testified that he believed defendant was placing something into the vehicle. While these observations standing alone may not justify a *Terry* stop, the totality of the circumstances indicates that Sergeant Forbes had reasonable articulable suspicion to justify the stop.

¶ 50　We further observe that the officers testified they were conducting surveillance on the block due to high gang activity. See *People v. Hood*, 2019 IL App (1st) 162194, ¶ 65. Officer Daly testified that while he was conducting surveillance he observed three men soliciting drugs. Accordingly, the fact the location where defendant was stopped was also an area where there was gang activity and drug solicitation is one aspect of the totality of the circumstances the trial court considered. See *Timmsen*, 2016 IL 118181, ¶ 13 (officers are not required to ignore the relevant characteristics of a location in determining whether the circumstances are suspicious to warrant further investigation). In sum, we conclude that reasonable articulable suspicion existed where

Sergeant Forbes was aware of the police radio dispatch of a possible shooting occurring within close proximity and time to defendant's location and Officer Daly's observations.

¶ 51    In reaching this determination, we have considered *Florida v. J.L.*, 529 U.S. 266 (2000), upon which defendant relies to support his contention that the radio dispatch did not provide Sergeant Forbes with a basis for reasonable suspicion to stop him.  In *J.L.*, the police received an anonymous tip via telephone that a young African American male standing at a particular bus stop and wearing a plaid shirt was carrying a gun.  *J.L.*, 529 U.S. at 268.  Based on that tip, officers arrived at the specified bus stop and observed three African-American males, one of whom was wearing a plaid shirt, standing there.  *Id.*  Although the defendant, who was in the plaid shirt, made no threatening or otherwise unusual movements and officers did not see a firearm, "an officer instructed him to place his hands up on the bus stop [*sic*] and frisked him," seizing a gun from his pocket.  *Id.*  The Supreme Court held that the anonymous tip at issue, without more, was insufficient to justify a *Terry* stop.  *Id.*  In doing so the Court reasoned that in certain situations an anonymous tip, suitably corroborated, exhibits "sufficient indicia of reliability to provide reasonable suspicion" to make a *Terry* stop, and found that no such corroboration was present in the case before it.  *J.L.*, 529 U.S. at 270-72.  Here, in contrast, Sergeant Forbes did not stop defendant solely based on the radio dispatch, but also based on Officer Daly's observations as well as the high-crime location and the timing of defendant's presence on the block.  See *McMichaels*, 2019 IL App (1st) 163053, ¶ 24 ("the reliability of the tip that resulted in the officers' dispatch is not dispositive of the validity of the *Terry* stop").  In this case, the tip was just one of several factors that, viewed from the perspective of a reasonable officer that made the *Terry* stop valid.  See *id.*

¶ 52                                Probable Cause to Arrest

¶ 53     Defendant further contends that the recovery of the firearm did not create probable cause for his arrest because mere possession of a firearm outside the home, without more, is not a crime and, at the time of his arrest, the officers did not know whether he lacked a concealed carry license or had felony convictions.

¶ 54     In response, the State asserts that the officers did not have to wait to establish with absolute certainty that defendant was committing a crime before arresting him.  The State maintains that the totality of the circumstances provided the officers with a reasonable basis to believe that defendant was not in lawful possession of the firearm.

¶ 55     An arrest executed without a warrant is valid only when it is supported by probable cause.  *People v. Grant*, 2013 IL 112734, ¶ 11.  "Probable cause to arrest exists when the facts known to the officer at the time of the arrest are sufficient to lead a reasonably cautious person to believe that the arrestee has committed a crime."  *People v. Wear*, 229 Ill. 2d 545, 563-64 (2008).  The existence of probable cause depends on "the totality of the circumstances at the time of the arrest" and "is governed by commonsense considerations."  *Grant*, 2013 IL 112734, ¶ 11.  "[T]he calculation concerns the probability of criminal activity, rather than proof beyond a reasonable doubt."  *Id.*

¶ 56     We initially acknowledge that "under the current legal landscape, police cannot simply assume a person who possesses a firearm outside the home is involved in criminal activity."  *People v. Thomas*, 2019 IL App (1st) 170474, ¶ 40.  In *People v. Aguilar*, 2013 IL 112116, our supreme court held that a portion of the aggravated unlawful use of a weapon statute—which "categorically prohibit[ed] the possession and use of an operable firearm for self-defense outside the home"—violated the second amendment of the United States Constitution.  *Id.* ¶ 21.  The

supreme court explained that "the second amendment right to keep and bear arms extends beyond the home" but is still subject to meaningful regulation. *Id.* ¶¶ 20-21. In Illinois, those regulations include laws such as the unlawful possession of a weapon by a felon statute (720 ILCS 5/24-1.1(a) (West 2016)), which prohibits felons from possessing firearms. Other regulations include the requirement that, in order to possess a handgun, a person must carry a Firearm Owner's Identification (FOID) card issued to him or her by the state police. 430 ILCS 65/2 (West 2016).

¶ 57 The Firearm Concealed Carry Act further provides that, if an officer initiates an investigative stop, upon the request of the officer, a licensee must disclose that he or she possesses a concealed firearm, present his or her license, and identify the firearm's location. 430 ILCS 65/10(h). Pursuant to section 108-1.01 of the Code of Criminal Procedure of 1963 (Code) (725 ILCS 5/108-1.01 (West 2016)), when an officer has stopped a person for temporary questioning and "reasonably suspects that he or another is in danger of attack, he may search the person for weapons" and may take the weapon "until the completion of the questioning, at which time he shall either return the weapon, if lawfully possessed, or arrest the person so questioned."

¶ 58 Defendant was arrested on November 9, 2016, after *Aguilar* was decided. On that date, the categorical prohibition on the possession of an operable firearm outside the home was unconstitutional. As the officers did not inquire whether defendant had a concealed carry license or felony convictions before arresting him, defendant maintains he was arrested without probable cause. We disagree.

¶ 59 Our supreme court has explained that "the existence of probable cause depends upon the totality of the circumstances at the time of the arrest." *Wear*, 229 Ill. 2d at 564. These circumstances include "the factual and practical considerations of everyday life on which

reasonable and prudent men, not legal technicians, act." (Internal quotation marks omitted.) *Id.* "The standard is the probability of criminal activity, not proof beyond a reasonable doubt or even that it be more likely than not." *People v. Gocmen*, 2018 IL 122388, ¶ 19.

¶ 60 Applying these principles here, the totality of the circumstances when the officers arrested defendant suggested criminal activity. To briefly restate the facts, the officers were conducting surveillance on the block due to citizen complaints of gang activity. While conducting this surveillance Officer Daly observed defendant speak with three men (whom he had just viewed attempting to solicit drugs) and then return to his vehicle. As defendant opened the rear door he glanced quickly back and forth with his hands near his waistband. Defendant then moved out of view into the vehicle. It was Officer Daly's belief that defendant was placing something into the vehicle. These observations were relayed to Sergeant Forbes along with the police radio dispatch of a nearby "possible shooting" involving a vehicle similar to that driven by defendant which had been viewed traveling in the same direction defendant had traveled. Then, after defendant was approached by the officers and asked whether any weapons were inside the vehicle, defendant responded he did not know. Taken in their totality, these circumstances suggest to a reasonably prudent person that there was a probability that the handgun recovered was not legally possessed.

¶ 61 We further observe that while the officers did not inquire about defendant's criminal history or firearm licenses at that moment, "the existence of a possible innocent explanation, like defendant's possession of the required gun licenses, [does] not necessarily negate probable cause." *Thomas*, 2019 IL App (1st) 170474, ¶ 39. Instead, defendant's actions of concealing something in the back seat of the vehicle coupled with the police radio dispatch and Officer Hronopoulos' observations of the handgun in plain view were all practical considerations

justifying probable cause that defendant illegally possessed the firearm. See *People v. Smith*, 2015 IL App (1st) 131307, ¶ 29 ("furtive movements may be considered justification for performing a warrantless search when coupled with other circumstances tending to show probable cause," even though "looks, gestures, and movements taken alone are insufficient" (internal quotation marks omitted)).

¶ 62    We also acknowledge that the officers did not question defendant under section 108-1.01 of the Code or the Firearm Concealed Carry Act to determine whether he had a valid concealed carry license or felony convictions. However, defendant also did not volunteer information to the officers. As noted by this court in *McMichaels*, "A reasonable person who was not committing a crime (*i.e.*, who had the valid licenses) would be expected to tell the officers he was licensed to have and carry a gun." *McMichaels*, 2019 IL App (1st) 163053, ¶ 38. When the officers initially asked defendant if he had a firearm in the vehicle, he could have notified them that he lawfully had a gun. Then, during the *Terry* stop, when Officer Hronopoulous observed the firearm in plain view, defendant had an opportunity to offer the information that he was properly licensed or otherwise in lawful possession. He did not. When the officers obtained the weapon, defendant could have offered up license information, but once more, he did not. Defendant had multiple opportunities to protect his legitimate interests and volunteer the information that he was licensed. In the absence of such information and in combination with all other factors previously described, even though the officers did not inquire about whether defendant had a valid license, the officers were fully justified in stopping and arresting defendant before they could confirm his licensure and the lawfulness of the possession of the gun without his help. See *Thomas*, 2019 IL App (1st) 170474, ¶ 38.

¶ 63                                        CONCLUSION

¶ 64    For the reasons stated above, we affirm the judgment of the circuit court of Cook County.

¶ 65    Affirmed.